**UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re:<br><br>Ashley I, LLC,<br><br>Debtor. | Case No. 16-00559-dd<br><br>Chapter 11 |
| In re:<br><br>Ashley II of Charleston, LLC,<br><br>Debtor. | Case No. 16-00560-dd<br><br>Chapter 11 |

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364,
AND 507 FOR ENTRY OF AN ORDER: (I) APPROVING POST-PETITION
FINANCING; (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS; AND
(III) APPROVING PRE-PETITION SUPPORT AGREEMENT**

Ashley I, LLC ("*Ashley I*") and Ashley II of Charleston, LLC ("*Ashley II*") (Ashley I and Ashley II will be collectively hereinafter referred to as the "Debtors" or "*Borrowers*"), the above-captioned debtors in possession, hereby move this Court pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c), 364(d), 364(e) and 507(b) for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Obtain Post-Petition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; and Approving a Pre-Petition Support Agreement (the "*Motion*"). This Motion seeks authorization for the Debtors to obtain secured post-petition financing and other extensions of credit for up to $475,000 on a priming lien and superpriority basis (the "*DIP Facility*") pursuant to

1

the terms and conditions of that certain Post-Petition Loan and Security Agreement (together with all schedules, exhibits, and annexes thereto, and as at any time amended, supplemented, restated, or otherwise modified from time to time, the "*DIP Loan Agreement*") between the Debtors and Magnolia/ARC Lender, LLC ("*MARC*", or the "*DIP Lender*"), substantially in the form annexed hereto as **Exhibit A**. The Motion further requests the Court's approval of the terms of the pre-petition Support Agreement (the "*Support Agreement*") between the Debtors and MARC, which Support Agreement creates the underlying basis for MARC's DIP Facility offer. The Support Agreement is attached hereto as **Exhibit B**.

The DIP Facility calls for the Debtors to borrow an amount not to exceed the aggregate principal amount of $475,000 in return for priming first priority liens on the Debtors' property, adequate protection for the DIP Lender's interests in its pre-petition collateral, and superpriority claims in the Debtors' bankruptcy cases. The Debtors propose to use the DIP Facility to pay its ordinary monthly operating expenses pursuant to an approved budget (attached hereto as **Exhibit C**) and to pay post-petition professional fees upon Court approval. The DIP Facility requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates, is otherwise fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is necessary to afford the Debtors the ability to sell certain assets at fair market value for the benefit of their estates and their creditors. The Debtors have determined they cannot otherwise obtain unsecured financing or financing on otherwise better terms than offered by the DIP Loan Agreement. In support of this Motion, Debtors would show as follows:

**Jurisdiction and Venue**

1. On February 8, 2016 the Debtors voluntarily filed simultaneous Chapter 11 bankruptcies under Title 11 of the United States Bankruptcy Code. The Debtors are operating their

businesses and managing their assets as debtors in possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code.

2. This Court has subject matter jurisdiction over the Motion pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(D). The Court can exercise its subject matter jurisdiction pursuant to 28 U.S.C. §157(b)(1). Venue of these proceedings and the Motion is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

3. As of the filing of this Motion, no committee has been appointed to represent the interest of unsecured creditors in this case pursuant to § 1102(a) of the Bankruptcy Code.

## **Background**

4. The Debtors are single asset real estate entities that began acquiring real estate in 2002 for the purpose of developing a multi-use real estate development as a proposed urban infill project along the Ashley River in the Neck area of Charleston and North Charleston, South Carolina. The Debtors' current real property holdings consist of approximately 182 acres, composed of roughly 134 acres of highland and roughly 48 acres of marsh along the Ashley River north of Wagener Terrace and west of 1-26.

5. For many years, dating back to the 19th century, the Neck was an industrial area that included phosphate fertilizer plants, lumber treatment plants, chemical plants, and the like. The extensive uses of contaminants on the Neck caused its lands and water to become contaminated, to the extent that several tracts of land in the Neck were designated "Superfund Sites" by the United States Environmental Protection Agency ("EPA").

6. The Debtors intended to acquire and remediate lands on the Neck, including those designated as Superfund Sites, and to develop a mixed-use community to serve as a model for urban

redevelopment nationwide. The Debtors acquired the land and they began the planning and rezoning process.

7. Initially, the City of Charleston issued bonds to finance the infrastructure improvements for the project and funded approximately $15.6 million dollars in infrastructure improvements.

8. Prior to the recession of 2008, the Debtors' investments in the development exceeded $50,000,000, funds which were used to acquire the land and operate the larger development plan.

9. As part of its efforts, Ashley was actively involved in remediation of four (4) CERCLA sites and sixteen (16) additional South Carolina Voluntary Cleanup Contract sites in the Charleston neck area. Ashley had planned to utilize recent amendments to CERCLA, the Small Business Liability Relief and Brownfields Revitalization Act of 1998, to remediate and redevelop the contaminated land, and to recover the costs of clean up from the parties responsible for the contamination. Ashley brought environmental management and technical expertise, assisted in the cleanup of several sites, performed actual cleanup in some instances, and, with regard to a large waterfront tract discussed below, filed an action against other responsible parties under CERCLA to seek judicial assistance in requiring the prior polluters to contribute towards the ultimate remediation of the properties.

10. The Columbia Nitrogen Site ("*Columbia Nitrogen Parcel*"), which makes up approximately 33 acres of the real property and is owned by Ashley II, is the only parcel where Ashley was unable to secure former owners or operators' assistance with remediation prior to acquisition. The EPA previously designated the former Columbia Nitrogen Parcel, as the Columbia Nitrogen Superfund Site, adjacent to the Ashley River ("the Site"). Ashley owns 30.67 acres of the Site, Robin W. Hood, II owns two acres, which are leased to Robin Hood Container Express ("*RHCE*"); and a

4

roadway or road right-of-way over 1.28 acres of the Site is owned by the City of Charleston. Debtors' ownership of the Columbia Nitrogen Parcel has spawned years of both federal and state court litigation that remains ongoing at the Petition Date.

11. Unfortunately, this environmental litigation halted the Debtors' ability to fund further cleanup and development of the Ashley I and Ashley II properties, and the Debtors now seek chapter 11 protection in order to seek court approved sales of their properties to ensure future cleanup and development of these properties to the great benefit of the Charleston community.

12. The Debtors' need to obtain post-petition credit pursuant to the DIP Facility is immediate and critical to enable the Debtors the prospective ability to sell certain assets at fair market value to allow the Debtors to maintain and protect their property pending sale or other disposition, and to administer their estates. The ability of the Debtors to pay expenses to appropriately market and sell their property, to pay expenses necessary to maintain and protect the property pending sale or other disposition, and to administer their estates, requires the availability of funding from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates, their creditors, and their equity holders.

13. The Debtors do not have sufficient available sources of funding to maintain and protect their properties in the ordinary course of business without the DIP Facility, absent use of funds in the approximate amount of $335,000.00 which are being held for the intended use of payment of unsecured creditors in this case (the "*Carve-Out*" as further defined and described hereinbelow).

**The Proposed DIP Facility**

14. By this Motion, the Debtors seek approval of the DIP Facility in return for priming, first priority liens on substantially all of the Debtors' property, and superpriority claims in the

Debtors' bankruptcy cases. Obtaining the DIP Financing is needed to continue operations so that sales of substantially all of the Debtors' assets may be effectuated. Throughout the sale and judicial processes, Debtors need to pay operational expenses as set forth in the budget attached as **Exhibit C** plus their professionals' fees upon Court approval. Without the DIP Financing, the Debtors will not have sufficient available sources of working capital and funding to successfully sell their assets and formulate a confirmable chapter 11 plan.

15. MARC asserts that MARC, as the successor in interest to Bank of America, N.A. ("*Bank of America*"), is the Debtors' pre-petition lender under certain pre-petition loans. MARC asserts that it is owed an amount equaling $18,638,332.65 on its pre-petition loans to the Debtors. As the Debtors' pre-petition lender, MARC asserts that it holds properly perfected, first priority mortgages and security interests in and to substantially all of the Debtors' assets, except unencumbered funds of $337,324 presently held in escrow to which MARC's lien does not attach (collectively, the "*Pre-Petition Collateral*").

16. The EPA asserts a federal lien against Ashley II's Columbia Nitrogen Parcel in the amount of approximately $3.7 Million (the "*EPA Lien*"). MARC asserts, and the Debtor agrees, that the EPA Lien wholly undersecured.

17. The DIP Facility contemplates the priming of the pre-petition MARC mortgages and liens as well as the EPA Lien under § 364(d) of the Bankruptcy Code. The DIP Loan Agreements propose to grant the DIP Lender valid, binding, enforceable, non-avoidable and automatically and properly perfected first priority, senior security interests in and liens (the "*DIP Liens*") upon all of each Debtor's assets (both real and personal *except* as set forth below), including, without limitation, all of each Debtor's real estate and improvements thereto, accounts, contract rights, chattel paper, documents, instruments, supporting obligations, general intangibles, equipment

(including machinery and fixtures), and books and records (both tangible and electronic) relating to any assets of such Debtor, and all proceeds (including insurance proceeds) of the foregoing, in each case whether such assets are now in existence or hereafter created, acquired or arising and wherever located (all such real and personal property, including, without limitation, all Pre-Petition Collateral, being collectively hereinafter referred to as the "*Collateral*").

18. Notwithstanding the foregoing or anything to the contrary in the DIP Financing Agreement, the DIP Liens shall not attach to any of the following property: (i) any claims pursuant to §§ 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code (the "*Avoidance Claims*"); (ii) any proceeds or property recovered in connection with the successful prosecution or settlement of any Avoidance Claim (the "*Avoidance Proceeds*"); or (iii) the Carve-Out described herein.

19. With respect to the DIP Facility advances and the approximately $335,000.00 Carve-Out proceeds escrowed by the Debtors, the DIP Liens and the DIP Superpriority Claim shall also be subject and subordinate to the payment of the following: (i) all unpaid Professional Expenses of Professionals, to the extent incurred prior to or after the occurrence of a Carve-Out Event (as defined below), but only to the extent that such Professional Expenses are allowed and payable by order of the Court and do not exceed in aggregate $475,000; and (ii) accrued and unpaid quarterly fees to be paid to the U.S. Trustee pursuant to 28 U.S.C. § 1930 (the "*U.S. Trustee Fees*") (clauses (i) and (ii) being collectively the "*Carve-Out*"). The term "*Carve-Out Event*" shall mean the termination of the DIP Facility, whether such termination results from any action of the DIP Lender or any Debtor, expiration of the DIP Term, or otherwise.

20. In addition to the DIP Liens, the DIP Facility also calls for the DIP Lender to receive administrative priority in accordance with, and constituting an allowed superpriority claim (the

"*DIP Superpriority Claim*") pursuant to § 364(c)(1) of the Bankruptcy Code over all other administrative expenses in the Chapter 11 Cases of the kind specified in, or ordered pursuant to, §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(e), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 or 1114 of the Bankruptcy Code.  The DIP Facility contemplates that no costs or administrative expenses that have been or may be incurred in the Debtors' chapter 11 cases, whether in any matters or proceedings related hereto, and no priority claims or superpriority claims, are or will be prior to or on a parity with the DIP Superpriority Claim of the DIP Lender; provided, however, that the DIP Superiority Claim shall not attach to any Avoidance Claims or the Avoidance Proceeds.  Notwithstanding the foregoing, the DIP Superpriority Claim shall also be subject to the Carve-Out.

21.   The DIP Loan Agreement attached as is specifically incorporated in this Motion by reference.  The DIP Loan Agreement and proposed Order filed along with this Motion set forth in greater detail the full terms of the DIP Facility.

22.   Section §364(c) of the Bankruptcy Code provides that the Court, if the Debtor is unable to obtain unsecured financing from any alternative source, may authorize the obtaining of credit or the incurring of debt secured by a lien on property of the estate that is not otherwise subject to a lien.  Given their current financial condition, financing arrangements, and capital structure, the Debtors and their advisors have determined that the Debtors are not viably able to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.  The Debtors and their advisors have determined that the Debtors are unable to obtain unsecured credit or upon otherwise better terms than the DIP Facility. Financing on a post-petition basis is not otherwise available without (x) this Court's approval of the DIP Facility.

23.   The Debtors are unable to obtain financing on an unsecured basis.  Debtors are

informed and believe that the above-described facts support its request for authorization to obtain post-petition financing and incur post-petition debt. In re Crouse Group, Inc., 71 B.R. 544 (Bankr. E.D. Pa.), aff'd, 75 B.R. 553 (E.D. Pa. 1987)(in determining whether to authorize post-petition financing under § 364(c), the court will determine whether (1) the debtor has reasonably attempted to obtain unsecured credit by allowing a lender only an administrative claim; (2) the credit transaction is necessary to preserve the assets of the estate; and (3) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender). See also In re Snowshoe Co., Inc., 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.").

24. The Debtors, therefore, request an order authorizing the Debtors to enter into the Proposed DIP Agreement with Lender so that the Debtors may maximize the value of the estate for both secured and unsecured creditors.

25. The DIP Financing as outlined in this Motion is necessary for the continued operation of the Debtors' businesses. Approval of the DIP Financing arrangement with Lender will allow the Debtors the opportunity to maximize the value of the bankruptcy estates for both secured and unsecured creditors.

**The Support Agreement**

26. Pre-petition upon the Debtors' advising MARC of their intention to file for chapter 11 protection, and in contemplation of the need for post-petition lending and an eventual sale of Debtors' assets, the Debtors and MARC entered into the Support Agreement dated February 4, 2016 and attached hereto as **Exhibit B**. The Debtors and MARC entered the Support Agreement in contemplation of the filing to receive certain assurances from one another related to financing and

opportunity to sell/purchase all or some of the Debtors properties. Pursuant to the Support Agreement, MARC agreed to (1) provide pre-bankruptcy loan advances to Debtors to enable them to pay bankruptcy professionals for filing preparation, (2) to provide debtor-in-possession financing, (3) to modify and amend the parties' pre-petition Cooperation Agreements to make the pre-petition MARC loans non-recourse secured indebtedness without personal liability for the Debtors and to waive its right to any unsecured deficiency claim it otherwise might have in the Debtors' bankruptcy cases, (4) to release and/or reassign Ashley II's judgment against PCS, (5) to make one or more offers to purchase the Debtors properties including a cash component for payment of other creditors, and (6) not assert an interest in the Ashley II escrowed funds.

27. The Support Agreement between the parties is a necessary aspect of and consideration for the DIP Facility outlined herein. It also provides the Debtors with the mechanism to facilitate the eventual starting point for its future sales and submission of a confirmable plan in this chapter 11. Therefore, the Debtors and MARC request that the Court approve the Support Agreement as a part of the DIP Facility outlined in this Motion.

WHEREFORE, based upon the foregoing, the Debtors requests Interim and Final Orders (i) approving the Debtor's entry into the DIP Facility set forth herein; (ii) authorizing the Debtors to execute and enter into the DIP Loan Agreement with MARC; (iii) granting the DIP Facility superpriority administrative expense claim status in the Debtors' chapter 11 cases; (iv) granting the DIP Lender automatically perfected priming, first priority liens and security interests in the Collateral; (v) approving the pre-petition Support Agreement between the parties; (vi) scheduling an expedited interim hearing and a final hearing on this Motion; and (vii) granting such other and further relief as the Court may deem appropriate.

RESPECTFULLY SUBMITTED on this the 8th day of February 2016 at Columbia, South Carolina.

          MCCARTHY LAW FIRM, LLC

By:    /s/Daniel J. Reynolds, Jr
        G. William McCarthy, Jr., I.D.#2762
        Daniel J. Reynolds, Jr., I.D.#9232
        W. Harrison Penn, I.D.#11164
        *Attorneys for the Debtors*
        1517 Laurel Street
        P.O. Box 11332
        Columbia, SC 29201-1332
        (803) 771-8836
        (803) 765-6960 (fax)
        dreynolds@mccarthy-lawfirm.com