# POST-PETITION LOAN AND SECURITY AGREEMENT

THIS POST-PETITION LOAN AND SECURITY AGREEMENT (the "Agreement") is dated as of February ___, 2016, by and among Ashley I, LLC ("**Ashley I**"), Ashley II of Charleston, LLC ("**Ashley II**", and together with Ashley I, the "**Borrowers**") and Magnolia/ARC Lender, LLC ("**Lender**"), each of which is a "**Party**" and collectively are the "**Parties**" to this Agreement..

# RECITALS:

WHEREAS, Borrowers are debtors-in-possession under Chapter 11 of the Bankruptcy Code (11 U.S.C. § 101, *et seq.*) in cases (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the District of South Carolina (together with any other court having jurisdiction over the Chapter 11 Cases or any proceedings therein from time to time, the "Bankruptcy Court"), as Case No. 16-00559-dd and Case No. 16-00560-dd, which Chapter 11 Cases have been joined for joint administration under Case No. [_____]; and.

WHEREAS, Lender is willing to provide a credit facility to Borrowers in connection with the Chapter 11 Cases in accordance with the provisions of that certain Support Agreement, dated as of February 4, 2016 (the "Support Agreement"), subject to the terms and conditions of this Agreement and subject to the terms and conditions set forth in the orders of the Bankruptcy Court approving the proposed financing.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained and to induce Lender to extend credit to Borrowers, the parties agree as follows:

## 1.   DEFINITIONS; RELATED TERMS.

1.1   Certain UCC Terms.   Any term used in this Agreement or in any financing statement filed in connection herewith which is defined in the Uniform Commercial Code ("UCC") and not otherwise defined in this Agreement or in any other Post-Petition Loan Document shall have the meaning given to the term in the UCC, including, without limitation, Accession, Account Debtor, Chattel Paper, Account, Commercial Tort Claim, Deposit Account, Document, Electronic Chattel Paper, Equipment, Fixture, Instrument, Inventory, Investment Property, Letter-of-Credit Right, Proceeds, Supporting Obligation, and Tangible Chattel Paper.

1.2   Defined Terms.   Capitalized terms that are not otherwise defined herein shall have the meanings set forth in this Schedule I attached hereto.

1.3   Financial Terms.   All financial terms used herein shall have the meanings assigned to them under GAAP unless another meaning shall be specified. When determining the amount of any Debt for purposes of this Agreement, any election by any Borrower or any other Borrower to measure an item of Debt using fair value (as permitted by Statement of Financial Accounting Standards No. 159 or any similar accounting standard) shall be disregarded and such determination shall be made as if such election had not been made.

**EXHIBIT  A**

1.4    Rules of Construction.  The terms "herein," "hereof," and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph, or subdivision. Any pronoun used shall be deemed to cover all genders. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding." The section titles, table of contents, and list of exhibits appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All references to (a) statutes and related regulations shall include all related rules and implementing regulations and any amendments of same and any successor statutes, rules, and regulations; (b) any agreement, instrument, or other documents (including any of the Post-Petition Loan Documents) shall include any and all modifications and supplements thereto and any and all restatements, extensions, or renewals thereof to the extent such modifications, supplements, restatements, extensions, or renewals of any such documents are permitted by the terms thereof; (c) to any property of any Borrower shall mean and include all property of the Borrowers' bankruptcy estates; (d) any Person (including Borrowers or Lender) shall mean and include the successors and permitted assigns of such Person; (e) "including" and "include" shall be understood to mean "including, without limitation," regardless of whether the "without limitation" is included in some instances and not in others (and, for purposes of each Post-Petition Loan Document, the parties agree that the rule of *ejusdem generis* shall not be applicable to limit a general statement, which is followed by or referable to an enumeration of specific matters to matters similar to the matters specifically mentioned). A Default or an Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing by Lender pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided in this Agreement. An Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by Lender. Whenever the phrase "to Borrowers' knowledge" or words of similar import relating to the knowledge or the awareness of a Borrower are used in this Agreement or other Post-Petition Loan Documents, such phrase shall mean and refer to (i) the actual knowledge of a Senior Officer of any Borrower or (ii) the knowledge that a Senior Officer of any Borrower would have obtained if he had engaged in good faith and diligent performance of his or her duties.

## 2.    THE CREDIT FACILITY.

2.1    Post-Petition Loan Commitment.  Subject to the terms and conditions of this Agreement and the Support Agreement, Lender agrees to make Advances under the Post-Petition Loan to Borrowers from time to time during the Post-Petition Loan Term. Lender shall have no obligation to make an Advance under the Post-Petition Loan if doing so would, after giving effect thereto, cause the aggregate Advances made under the Post-Petition Loan to exceed the Post-Petition Loan Commitment. Borrowers shall use the proceeds of the Post-Petition Loan only in accordance with Section 2.2 and the Financing Orders. Anything to the contrary contained in this Agreement notwithstanding, the Post-Petition Loan shall be made in accordance with the Support Agreement and the terms of the Support Agreement shall be controlling to the extent that any terms or conditions contained in this Agreement are contrary thereto.

2.2    Use of Proceeds.  Subject to the terms of the Support Agreement and the orders of the Bankruptcy Court authorizing this credit facility, the proceeds of the Post-Petition Loan shall

**EXHIBIT  A**

be used by Borrower during the pendency of the Chapter 11 Cases exclusively for one or more of the following purposes: (i) to pay expenses authorized by the Support Agreement or with Lender's consent; (ii) to pay fees payable to the office of the U.S. Trustee; (iii) to pay Professional Expenses of a Professional Person to the extent specified in the Support Agreement and subject to authorization by the Bankruptcy Court; and (viii) to pay other expenses authorized by the Bankruptcy Court.   Nothing in this Section 2.2 shall be construed to waive Lender's right to object to any requests, motions or applications made in or filed with the Bankruptcy Court.

2.3    <u>Post-Petition Note</u>.  On the Closing Date, Borrowers shall execute and deliver to Lender a promissory note in the form of Exhibit C attached hereto and made a part hereof (the "Post-Petition Note"), which Post-Petition Note, together with Lender's records, shall evidence the Post-Petition Loan and interest accruing thereon.

2.4    <u>Interest</u>.

(a)    Agreement to Pay Interest.   Each Borrower agrees that interest shall accrue on all unpaid principal amounts of the Post-Petition Loan from the respective date each Advance under the Post-Petition Loan is made until such Post-Petition Loan is paid (whether at stated maturity, upon acceleration, or otherwise) at the rates of interest and at the times set forth in this Agreement.

(b)    Interest Rate.  The Post-Petition Loan shall bear interest at the Base Rate. All interest on the Post-Petition Loan and on all other Obligations shall be calculated on the presumed basis of a year of 360 days, for the actual number of days elapsed.

(c)    Default Rate.  At Lender's option, during the existence of any Event of Default, the principal amount of all Obligations shall bear interest at the Default Rate. In any event, the Default Rate shall automatically and without notice apply from the time Lender accelerates or is deemed to have accelerated the Obligations pursuant to Section 8.2 until such Obligations or any judgment thereon is paid in full.

2.5    <u>Method of Requesting Advances</u>.

(a)    Provisions Regarding Funding of Advances.   Lender shall have no obligation to honor any request for an Advance under the Post-Petition Loan if;

(i)    such request is deemed made after the Commitment Termination Date;

(ii)    doing so would cause the Post-Petition Loan Commitment to be exceeded;

(iii)    Lender determines that any condition precedent in Section 4.2 hereof or any other condition precedent to the making of such Advance is not then satisfied or will not be satisfied when such Advance is to be made; provided, Lender may make such Advance in its discretion and without regard to the existence of, and without being deemed to have waived, any Default or Event of Default which may then exist or arise from the making of such Advance.

**EXHIBIT  A**

(b)    Making Requests.  Each Advance Request shall specify (i) the date for the Advance under the Post-Petition Loan, which date must be a Business Day; and (ii) lawful instructions for the disbursement of the proceeds of such Advance.

2.6    Repayment of Post-Petition Loan.

2.7    Repayment of Obligations Generally.  All of the Obligations shall be payable in accordance with the terms of this Agreement and any Post-Petition Note, without defense, offset or counterclaim and in immediately available funds upon a sale of the Collateral. Prepayment may occur at any time without premium or other prepayment charge of any other nature.

2.8    All outstanding principal of the Post-Petition Loan and accrued Interest shall be due and payable upon the sale of Collateral securing the Post-Petition Loan, or on the Commitment Termination Date.

2.9

2.10

2.11    Effect of Commitment Termination.  On the Commitment Termination Date, all of the Obligations shall be immediately due and payable, and Lender shall have no further obligation to make an Advance under the Post-Petition Loan; provided, however, that Lender may after the Commitment Termination Date fund one or more Advance under the Post-Petition Loan and any such funding shall be deemed an Advance under the Post-Petition Loan.  All undertakings, agreements, covenants, warranties and representations of Borrowers contained in the Post-Petition Loan Documents shall survive any such termination and Lender shall retain its Liens upon all of the Collateral and all of its rights and remedies under the Post-Petition Loan Documents notwithstanding such termination until Full Payment of the Obligations.

2.12    Reimbursement Obligations.  Borrowers shall reimburse Lender for all legal, accounting, appraisal and other fees and expenses incurred by Lender (including reasonable fees and expenses of Lender Professionals) in connection with (i) the negotiation and preparation of any amendment or modification of the Post-Petition Loan Documents, any waiver of any Default or Event of Default thereunder, or any restructuring or forbearance with respect thereto; (ii) the administration of the Post-Petition Loan Documents and the transactions contemplated thereby; (iii) action taken to perfect or maintain the perfection or priority of any of Lender's Liens securing the Post-Petition Loan with respect to any of the Collateral; (iv) any inspection of or audits conducted for the Post-Petition Loan with respect to any of Borrowers' books and records or any of the Collateral; (v) any effort to verify, protect, preserve, or restore any of the Collateral or to collect, sell, liquidate or otherwise dispose of or realize upon any of the Collateral; (vi) any litigation, contest, dispute, suit, proceeding or action (whether instituted by or against Lender, any Obligor or any other Person) in any way arising out of or relating to any of the Post-Petition Loan Documents or the validity, allowance of amount of the Obligations, (vii) the monitoring of, participation in and protection or enforcement of any rights or remedies of Lender in the Chapter 11 Cases or any other Insolvency Proceeding; and (viii) any other action taken by Lender to enforce any of the rights or remedies of Lender against any Obligor or any Account Debtors to enforce collection of the Obligations or payments with respect to any of the Collateral.  All

4

amounts chargeable to Borrowers under this Section 2.10 shall constitute Obligations that are secured by all of the Collateral and, subject to the applicable provisions of the Financing Orders, shall be payable ON DEMAND to Lender. Borrowers shall also reimburse Lender for expenses incurred by Lender in its administration of any of the Collateral to the extent and in the manner provided in any of the Post-Petition Loan Documents. The foregoing shall be in addition to, and shall not be construed to limit, any other provision of any of the Post-Petition Loan Documents regarding the reimbursement by Borrower of costs, expenses or liabilities suffered or incurred by Lender.

2.13    Termination.    Borrowers may terminate this Agreement and the Post-Petition Loan Commitment before the Commitment Termination Date, in whole but not in part, by giving Lender 10 days' prior written notice. Any notice of termination shall be irrevocable. Lender may terminate this Agreement and the Post-Petition Loan Commitment at any time prior to the Maturity Date, without notice, during the existence of an Event of Default.

**3.    SECURITY AGREEMENT.**

3.1    Security Interest.

(a)    As security for the Full Payment of the Obligations, each Borrower hereby grants to Lender (for itself and its Affiliates) a continuing Lien on and security interest in and to all right, title, and interest of such Borrower in and to the Collateral, whether now owned or hereafter acquired by such Borrower (irrespective of whether the same existed on or is created or acquired after the Petition Date and wherever located).

(b)    Lender shall have no obligation to take any steps necessary to preserve any rights in the Collateral or to preserve any rights in the Collateral against senior or prior parties (which steps each Borrower agrees to take).

3.2    Liens Under Financing Orders.    The Financing Orders shall authorize the Liens and security interests granted to Lender pursuant to the provisions of this Section 3.

3.3    Administrative Priority.    Subject to the entry of the Interim Financing Order, and except for the Carve-Out provided in the Financing Orders, the Obligations will constitute allowed super-priority administrative expenses in the Chapter 11 Cases, having priority in payment over all other administrative expenses and unsecured claims against Borrowers of any kind or nature, whether now existing or hereafter arising, including all administrative expenses or Claims of the kind specified in or arising or ordered under Sections 105, 326, 328, 503(b), 506(e), 507(a), 507(b), 546(c) and 1114 of the Bankruptcy Code.

3.4    Financing Statements; Fixture Filings; Power of Attorney.    Each Borrower authorizes Lender to file any financing statements (and other similar filings or public records or notices relating to the perfection of Liens), fixture filings, and amendments thereto relating to the Collateral which Lender deems appropriate, in form and substance required by Lender, and to (a) describe the Collateral thereon (i) as "all personal property of the debtor," "all assets," or words of similar effect, if appropriate and permitted by applicable law, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC or any other applicable law, or (ii) by specific collateral category and (b) include therein all other

**EXHIBIT  A**

information which is required by Article 9 of the UCC or other applicable law with respect to the preparation or filing of a financing statement (or other similar filings or public records or notices relating to the perfection of Liens), fixture filing, or amendment. Each Borrower appoints Lender as its attorney-in-fact to perform all acts which Lender deems appropriate to perfect and to continue perfection of the Lien granted to Lender under any Security Agreement, including, without limitation, (x) the filing of financing statements (and other similar filings or public records or notices relating to the perfection of Liens), fixture filings, and amendments, (y) the execution in such Borrower's name of any agreements providing for Control over any applicable Collateral, and (z) the indorsement, presentation, and collection on behalf of such Borrower and in such Borrower's name of any Items or other documents necessary or desirable to collect any amounts which such Borrower may be owed, such power of attorney being coupled with an interest and is therefore irrevocable. Each Borrower grants Lender a license or other right to use, without charge, such Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks and advertising matter, and any Property of a similar nature, as it pertains to the Collateral, in advertising for sale and selling any Collateral, and such Borrower's rights under all licenses and all franchise agreements shall inure to Lender's benefit. Irrespective of any steps taken by Lender to perfect any security interest or other Lien granted or conveyed to Lender pursuant to any of the Post-Petition Loan Documents, all security interests and other Liens at any time granted or conveyed, or otherwise conferred upon, Lender pursuant to the Post-Petition Loan Documents or the Financing Orders shall be automatically perfected as provided in the Financing Orders without the necessity of the filing or recording of any other instrument or agreement, the taking of possession of any of the Collateral or any other action on the part of Lender. Each Borrower shall be liable for any and all expense incurred in connection with Lender's exercising its rights under this Section 3.4.

3.5    Entry.  Each Borrower (for itself and on behalf of its Subsidiaries) irrevocably consents to any act by Lender or its agents in entering upon any premises for the purposes of either (a) inspecting any Collateral or (b) taking possession of any Collateral; provided, that Lender or its agents shall not enter onto the any such premises for purposes of taking possession of any Collateral except when an Event of Default shall exist and only where permitted under the Bankruptcy Code or by Order of the Bankruptcy Court. Lender may enter such premises with reasonable notice and during normal business hours so long as no Default or Event of Default is then in effect, and Lender may enter such premises at any time with or without notice at any time that a Default or Event of Default exists. Each Borrower waives, as to Lender and its agents, any now existing or hereafter arising claim based upon trespass or any similar cause of action for entering upon any premises where Collateral may be located. Each Borrower also waives, as to Lender, any Lien it may have with, in and to the assets of any other Borrower stored at or located on any premises or real property owned, leased, or controlled by, or in the possession of, such Borrower.  Nothing in this section 3.5 shall be read to authorize Lender to seize Collateral of Borrowers without the proper authority of the Bankruptcy Court.

3.6    Other Rights.  Without limiting any Borrower's obligations under the Post-Petition Loan Documents, each Borrower authorizes Lender from time to time (a) to (i) take from any party and hold additional Collateral for the payment of the Obligations or any part thereof, (ii) exchange, enforce, or release such Collateral or any part thereof, and (iii) release or substitute any indorser or any party who has granted Lender any security interest in any property as security for the payment of the Obligations or any part thereof or any party in any way

**EXHIBIT  A**

obligated to pay the Obligations or any part thereof, and (b) during the existence of any Event of Default, to direct the manner of the disposition of the Collateral and the enforcement of any indorsements, guaranties, letters of credit, or other security or Supporting Obligations relating to the Obligations or any part thereof as Lender may be authorized to do by the Bankruptcy Court. Nothing in this section 3.6 shall be read to authorize Lender to seize Collateral of Borrowers without the proper authority of the Bankruptcy Court.

3.7    <u>Waiver of Marshaling</u>.  Each Borrower hereby waives any right it may have to require marshaling of its assets.

3.8    <u>Further Assurances</u>.  Each Borrower will, at its expense, cooperate with Lender in perfecting Lender's Lien in the Collateral.

3.9    <u>Lien Priority</u>.  The Liens and security interests granted to Lender pursuant to the provisions of this Section 3 and pursuant to any of the other Post-Petition Loan Documents shall be first priority Liens and security interests in the Collateral, except for Permitted Senior Liens.

3.10    <u>Turn Over of Collateral Proceeds</u>.  Upon written demand of Lender, Borrowers shall promptly turn over to Lender all proceeds received from any collection, sale or other disposition of any Collateral securing the Post-Petition Loan except as otherwise stated as to the Carve-Out.

**4.    CONDITIONS PRECEDENT TO EXTENSIONS OF CREDIT.**

4.1    <u>Conditions Precedent to Initial Advance</u>.  In addition to any other requirement set forth in this Agreement, Lender shall not be required to make an Advance under the Post-Petition Loan or make any other extensions of credit hereunder unless and until the following conditions shall have been satisfied, in the opinion of Lender and its counsel:

(a)    Post-Petition Loan Documents and Supporting Documents.  In connection with the initial Advance under the Post-Petition Loan, Borrowers shall cause to be delivered to Lender the following documents and items (each of which must be in form and substance satisfactory to Lender):

(i)    This Agreement;

(ii)    The Post-Petition Note; and

(iii)    UCC-1 searches and other Lien searches satisfactory to Lender showing no existing security interests in or Liens on the Collateral (other than Permitted Liens acceptable to Lender).

(b)    Conditions.  In connection with the initial Advance under the Post-Petition Loan, the following conditions shall have been satisfied or waived by Lender:

(i)    The Chapter 11 Cases shall have been commenced;

(ii)     The Interim Financing Order (A) shall have been entered after proper notice and a hearing and sufficient presentation of evidence to support all findings of fact and conclusions of law set forth in the form of proposed interim financing order reasonably approved by Lender; (B) shall be in full force and effect and shall not have been vacated, reversed, modified or stayed in any respect (and, if such order is the subject of a pending appeal, no performance of any obligation of any party shall have been stayed pending such appeal); and (C ) shall be in form and substance reasonably approved by Lender, including approval of the Carve-Out and other provisions as to the application of proceeds of the sale of any Collateral.

(iii)

(iv)

4.2     Conditions Precedent to Other Advances Under the Post-Petition Loan.   In addition to any other requirements set forth in this Agreement, Lender shall not be required to make an Advance under the Post-Petition Loan unless and until each of the following conditions shall have been satisfied, in Lender's sole opinion, and each request for an Advance under the Post-Petition Loan (whether or not a written Notice of Borrowing is required) shall be deemed to be a representation that all such conditions have been satisfied:

(a)     Notice of Borrowing.   If required by this Agreement or by Lender, Borrowers shall have delivered to Lender a Notice of Borrowing and such other reasonable information as Lender may request;

(b)     No Default.   No Default shall have occurred and be continuing or would result from the making of the requested Advance under the Post-Petition Loan;

(c)     Correctness of Representations.   All representations and warranties made to Lender by any Borrower in any Post-Petition Loan Document or otherwise in writing shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of date of the requested Advance under the Post-Petition Loan;

(d)     Limitations Not Exceeded.   The funding of any Advance under the Post-Petition Loan would not exceed the Post-Petition Loan Commitment;

(e)     Further Assurances.   Each Borrower shall have delivered such further information, documentation or assurances as Lender may reasonably require, which may include UCC financing statements (and other similar filings or public records or notices relating to the perfection of Liens) and, if applicable, certificates of title covering the Collateral shall duly have been recorded or filed in the manner and places required by law to establish, preserve, protect, and perfect the interests and rights created or intended to be created by the Security Agreement, and all taxes, fees, and other charges in connection with the execution, delivery, and filing of the Security Agreements and the financing statements (and any other similar filings or public records or notices relating to the perfection of Liens) shall have been paid ; and

**EXHIBIT  A**

(f)     Financing Orders.

(i)     The Interim Financing Order or the Final Financing Order, as applicable, shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect.

(ii)     With respect to all Advances under the Post-Petition Loan requested more than 45 days after the Petition Date, the final hearing on the Post-Petition Loan Motion shall have been held, with the presentation of evidence and the resolution of any objections to the Post-Petition Loan Motion or the proposed Final Financing Order in a manner reasonably satisfactory to Lender, and the Final Financing Order shall have been entered, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of Lender; and

(iii)     The Final Financing Order, when issued, shall be in form and substance reasonably approved by Lender.

## 5.     REPRESENTATIONS AND WARRANTIES.

To induce Lender to enter into this Agreement and to make the Post-Petition Loan or extend credit as provided for herein, each Borrower makes the following representations and warranties, all of which shall survive the execution and delivery of the Post-Petition Loan Documents. Unless otherwise specified, such representations and warranties shall be deemed made as of the date hereof and as of the date of each request for a Post-Petition Loan or extension of credit hereunder:

5.1     <u>Valid Existence and Power</u>.  Such Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation and is duly qualified or licensed to transact business in South Carolina. Each of such Borrower and each other Person which is a party to any Post-Petition Loan Document (other than Lender) has the power to make and perform the Post-Petition Loan Documents executed by it and, subject to entry of the Interim Financing Order by the Bankruptcy Court, all Post-Petition Loan Documents will constitute the legal, valid, and binding obligations of such Person, enforceable in accordance with their respective terms, subject only to bankruptcy and similar laws affecting creditors' rights generally.

5.2     <u>Authority</u>.  Upon entry of  the Interim Financing Order by the Bankruptcy Court, the execution, delivery, and performance of the Post-Petition Loan Documents by such Borrower and each other Person (other than Lender) have been duly authorized by all necessary actions of such Person, and do not and will not violate any provision of law or regulation, or any writ, order, or decree of any Governmental Entity or any provision of the governing instruments of such Person, and do not and will not, with the passage of time or the giving of notice, result in a breach of, or constitute a default or require any consent under, or result in the creation of any Lien upon any property or assets of such Person pursuant to, any law, regulation, instrument, or agreement to which any such Person is a party or by which any such Person or its respective properties may be subject, bound, or affected.

EXHIBIT  A

5.3     Authorizations.  All authorizations, consents, approvals, and licenses required under applicable law for the ownership or operation of the property owned or operated by any Borrower or for the conduct of any business in which it is engaged have been duly issued and are in full force and effect, and it is not in default, nor has any event occurred which with the passage of time or the giving of notice, or both, would constitute a default, under any of the terms or provisions of any part thereof, or under any order, decree, ruling, regulation, closing agreement or other decision or instrument of any governmental commission, bureau or other administrative agency or public regulatory body having jurisdiction over such Person, which default would have a Material Adverse Effect on such Person. Except as noted herein (including entry of the Interim and Final Financing Orders), no approval, consent or authorization of, or filing or registration with, any Governmental Entity is required with respect to the execution, delivery or performance of any Post-Petition Loan Document.

5.4     Title.  Each Borrower has good title to the Real Estate and all other assets shown in its financial statements free and clear of all Liens, except Permitted Liens. Each Borrower alone has full ownership rights in all Collateral.

5.5     Collateral.  Upon entry of the Interim Financing Order, and thereafter upon entry of the Final Financing Order, the Liens and security interests granted to Lender herein, pursuant to any Security Agreement and pursuant to the Financing Orders (a) constitutes Liens on all the Collateral and security interests under the UCC entitled to all of the rights, benefits, and priorities provided by the UCC.

5.6     Jurisdiction of Organization; Location.   The jurisdiction in which each Borrower is organized, the chief executive office of each Borrower, the office where each Borrower's books and records are located, all of each Borrower's other places of business, and any other places where any Collateral is located, are all correctly and completely indicated in the schedules provided in connection with the Pre-Petition Loan Documents or in a writing provided by Borrowers to Lender on or before the Closing Date.

5.7     Corporate Structure.  No Borrower has any Subsidiary.

5.8     Deposit Accounts.  Borrowers have no Deposit Accounts other than those listed in their Bankruptcy Schedules or the required debtor-in-possession bank accounts required to be opened

5.9     Insider.  Such Borrower is not, and no Person having "control" (as that term is defined in 12 U.S.C. § 375(b)(5) or in regulations promulgated pursuant thereto) of Borrower is known to Borrower to be, an "executive officer," "director," or "principal shareholder" (as those terms are defined in 12 U.S.C. § 375(b) or in regulations promulgated pursuant thereto) of Lender, of a bank holding company of which Lender is a subsidiary, or of any subsidiary of a bank holding company of which Lender is a subsidiary.

5.10     Sanctioned Persons; Sanctioned Countries.   None of such Borrower or its Affiliates (a) is a Sanctioned Person or (b) does business in a Sanctioned Country or with a Sanctioned Person in violation of the economic sanctions of the United States administered by OFAC. Borrower will not use the proceeds of any extension of credit hereunder to fund any

10

**EXHIBIT  A**

operation in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Country.

5.11   <u>Full Disclosure</u>.   Each Borrower has disclosed to Lender each fact and circumstance which such Borrower knows or should know and which, by itself or together with any other fact disclosed or undisclosed, could reasonably be expected to have Material Adverse Effect. No Post-Petition Loan Document or any other agreement, document, certificate, or statement delivered by a Borrower to Lender contains any untrue statement of a material fact or omits to state any material fact which is known or which should be known by such Person necessary to keep the other statements from being misleading.

## 6.   AFFIRMATIVE COVENANTS OF BORROWER.

Each Borrower covenants and agrees that from the date hereof until the Full Payment of the Obligations, such Borrower:

6.1   <u>Use of Post-Petition Loan Proceeds</u>.   Shall use the proceeds of the Post-Petition Loan only in accordance with the uses permitted by Section 2.2 and shall furnish Lender all evidence it may require with respect to such uses.

6.2   <u>Compliance with Bankruptcy Code, Rules and Orders</u>.   Shall comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Financing Orders and all other orders entered by the Bankruptcy Court in the Chapter 11 Cases.

6.3   <u>Maintenance of Business; Payment for Losses</u>.   Shall at all times maintain, preserve, and protect Borrowers' legal title to the Collateral. If any of such Borrower's Real Property suffers a casualty or is condemned by a Governmental Entity (each, a "Loss"), all proceeds of such Loss shall be paid over to Lender for application to the Obligations in accordance with this Agreement.

6.4   <u>Certain Notices</u>.   Shall provide Lender immediate notice of (a) the occurrence of a Default or Event of Default and what action (if any) such Borrower is taking to correct the same; (b) any litigation involving Borrowers or material changes in existing litigation or any judgment against it or its assets; (c) any damage or loss to the Collateral; (d) any Borrower's violation (or asserted violation) of (i) any applicable law that could reasonably be expected to (A) have a Material Adverse Effect or (B) give rise to  monetary liability in excess of $50,000 or (ii) the Bankruptcy Code; (e) any pleading filed with the Bankruptcy Court seeking relief from the automatic stay, conversion or dismissal of the Chapter 11 Case or reclamation of any Collateral; (f) any offer or other expression of interest from any Person to purchase any of the Collateral; and (g) any proposed sale of any of the Collateral (including with such notice copies of all drafts of all instruments and agreements applicable to any such sale), which shall specify the identity of the proposed purchaser, the terms of the proposed sale and the expected date of closing, subject to Bankruptcy Court approval.   Borrowers shall provide, or shall cause its counsel in the Chapter 11 Cases to provide, Lender's counsel with (x) copies of all pleadings, motions, reports, applications and other papers filed by Borrowers with the Bankruptcy Court to the extent such document has not otherwise been provided pursuant to an order of the Bankruptcy Court establishing notice procedures in the Chapter 11 Cases or otherwise as well

**EXHIBIT  A**

as (y) copies of all billing and expense statements received from any Professional Person. Borrowers shall include counsel for Lender on any "Special Notice List" or other similar list of parties to be served with papers in the Chapter 11 Case.

6.5    Inspections of Books and Records and Field Examinations; Appraisals.    Shall permit Lender and its agents to conduct inspections, appraisals, and field examinations of the Collateral at such times and with such frequency as Lender may request from time to time, with (a) when no Default or Event of Default is in existence, reasonable notice thereof and (b) when any Default or Event of Default is in existence, no notice thereof.

6.6    Financial Information.    Shall maintain books and records in accordance with GAAP and shall furnish to Lender the following periodic financial information:

(a)    Borrowers shall prepare and deliver such financial reports as Lender may from time to time reasonably require, each prepared with respect to such periods and with respect to such information and reporting as Lender may reasonably request, including financial statements.

(b)    Other information.    Such other reasonable information requested by Lender from time to time concerning the business, properties, or financial condition of the Borrowers.

6.7    Subordination.    Shall cause all (a) Debts and other obligations not in existence on the Closing Date but hereafter owed to any Affiliate to be subordinated to the Liens securing the Obligations, and (b) all trade debt payable by a Borrower to any Affiliate to be subordinated to the Obligations on terms satisfactory to Lender.

6.8    Further Assurances.    Shall at any time upon the request of Lender take such further action or execute or deliver to Lender any and all financing statements, fixture filings, security agreements, pledges, assignments, indorsements of certificates of title, mortgages, deeds of trust, opinions of counsel, and all other documents (collectively, the "Additional Documents") that Lender may reasonably request in form and substance reasonably satisfactory to Lender, to create, perfect, and continue perfected or to better perfect Lender's Liens in all of the assets of the Borrowers (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of Lender in any Real Property of the Borrowers, and in order to fully consummate all of the transactions contemplated hereby and under the other Post-Petition Loan Documents.    To the extent necessary and to the maximum extent permitted by applicable law, each Borrower authorizes Lender to execute any such Additional Documents in the applicable Borrower's name and authorizes Lender to file such executed Additional Documents in any appropriate filing office.

6.9    Compliance with Bankruptcy Code, Rules and Orders.    The Borrowers shall comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Financing Orders and all other orders entered by the Bankruptcy Court in the Chapter 11 Cases.

## 7.    NEGATIVE COVENANTS OF BORROWER

Each Borrower covenants and agrees that from the date hereof and until the Full Payment

**EXHIBIT  A**

of all Obligations and the termination of this Agreement, such Borrower:

      7.1    <u>Debt</u>.  Shall not create or permit to exist any Debt that is senior to or on par with the Obligations, other than the administrative priority expenses of the Borrowers' bankruptcy estates in the Chapter 11 Cases (the "Permitted Debt").

      7.2

      7.3

      7.4

      7.5    <u>Liens</u>.  Shall not create or permit or suffer to exist, other than Permitted Senior Liens, any Liens that are senior to or on par with the Obligations.

      7.6

      7.7

      7.8

      7.9

      7.10

      7.11

      7.12

      7.13   <u>Restricted Payments; Payments on Subordinated Debt</u>.  Shall not make any Restricted Payment and shall not make any payments of principal or interest on any subordinated Debt in violation of this Agreement or agreement to which Lender is a party unless authorized to do so by the Bankruptcy Court.

      7.14   <u>Payment of Claims</u>.  Shall not make any payment of principal or interest on account of any Claim against any Borrower that arose prior to the Petition Date, other than Claims that are authorized to be paid by the Bankruptcy Court.

    **8.**    **DEFAULT.**

      8.1    <u>Events of Default</u>.  Each of the following shall constitute an "Event of Default":

      (a)    Any Borrower shall fail to pay within 3 Business Days when due any principal of or interest on any Note, any fee or other amounts due to Lender hereunder or any other Post-Petition Loan Document, or (except as provided in (b) and (c) below) any other Obligations; or

**EXHIBIT  A**

(b)     Any Borrower shall default on the performance of any agreement, covenant, or obligation contained in Sections 6 or 7 and such Default is not cured within 10 Business Day after the notice of the occurrence of such Default from Lender to Borrower; or

(c)     The Lender reasonably deems as unacceptable the Interim Financing Order or the Final Financing Order, or any amendment or modification thereof;.

(d)     Any Borrower or any other party to any Post-Petition Loan Document (other than Lender) shall default on the performance of any other agreement, covenant, or obligation contained in this Agreement or such Post-Petition Loan Document not provided for elsewhere in this Section 8 and the breach of such agreement, covenant, or obligation shall not have been cured to Lender's reasonable satisfaction within 30 days after the sooner to occur of (i) any Senior Officer's receipt of notice of such breach from Lender and (ii) the date on which such failure or neglect first became known to any Senior Officer; provided, however, that such notice and opportunity to cure shall not apply in the case of any default on an agreement, covenant, or obligation which is not capable of being cured at all or within such 30-day period or which was a willful and knowing breach by a Borrower or such other party; or

(e)     Any representation or warranty made by any Borrower or any other party to any Post-Petition Loan Document (other than Lender) in this Agreement or any other Post-Petition Loan Document, or in any certificate or report furnished in connection with this Agreement or any other Post-Petition Loan Document, shall prove to have been untrue or incorrect in any material respect when made; or

(f)     Borrowers shall fail to comply with any of the provisions of the Financing Orders; a trustee shall be appointed in the Chapter 11 Cases; an examiner shall be appointed in the Chapter 11 Cases with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; the Chapter 11 Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or a motion for any such dismissal shall be filed by Borrowers.

8.2     Remedies.  During the existence of any Default, Lender may, without notice to any Borrower and at its option, refuse to make Post-Petition Loan, or make other extensions of credit to any Borrower.  During the existence of any Event of Default, but subject at all times to any limitations in the Financing Orders, Lender may, at its option, exercise from time to time all rights and remedies available to Lender under the Post-Petition Loan Documents to enforce collection of the Post-Petition Loan then outstanding and may take any or all of the following actions:

(a)     Lender may declare any or all Obligations to be immediately due and payable (if not earlier demanded), terminate its obligation to make Post-Petition Loan and other extensions of credit to Borrowers, bring suit against any Borrower to collect the Obligations, exercise any remedy available to Lender hereunder or at law, and take any action or exercise any remedy provided herein or in any other Post-Petition Loan Document or under applicable law,

(b)     Without waiving any of its other rights hereunder or under any other Post-Petition Loan Document, Lender shall have all rights and remedies of a secured party under the

14

**EXHIBIT  A**

UCC (and the Uniform Commercial Code of any other applicable jurisdiction) and such other rights and remedies as may be available under any of the Post-Petition Loan Documents, under the Financing Orders, under other applicable law, or pursuant to contract. Each Borrower shall be liable for any deficiencies in the event the proceeds of the disposition of the Collateral do not result in Full Payment of the Obligations.

Nothing in this section 8.2 shall be read to authorize Lender to seize Collateral of Borrowers without the proper authorization of the Bankruptcy Court.

## 9. MISCELLANEOUS.

9.1  <u>No Waiver, Remedies Cumulative</u>.  No failure or delay on the part of Lender to exercise any right under this Agreement, any other Post-Petition Loan Document, or applicable law shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and are in addition to any other remedies provided by applicable law, any Post-Petition Loan Document, or otherwise.

9.2  <u>Survival of Representations</u>.  All representations and warranties made in this Agreement and the other Post-Petition Loan Documents shall survive the making of any extension of credit hereunder and the delivery of any Note and shall continue in full force and effect until the full and final payment and performance of the Obligations and the termination of this Agreement.

9.3

9.4  <u>Notices</u>.  Any notice or other communication hereunder or under the Note to any party hereto or thereto shall be by hand delivery, overnight delivery via nationally recognized overnight delivery service, facsimile with receipt confirmed, or registered or certified United States mail with return receipt and unless otherwise provided herein shall be deemed to have been given or made when delivered, telegraphed, faxed or, if sent via United States mail, when receipt therefor is signed by the receiver, postage prepaid, addressed to the party at its address specified below (or at any other address that the party may hereafter specify to the other parties in writing):

If to the Lender:

_____
_____
_____
Attn: _____

Telephone:  (___) ___-____
Facsimile:  (___) ___-____

with a copy (that shall not be effective for notice purposes) to:

Nexsen Pruet, LLC

15

**EXHIBIT  A**

P.O. Drawer 2426
Columbia, SC 29202
Attn:  Julio E. Mendoza, Jr., Esq.
Telephone:  (803) 540-2026
Facsimile:  (803) 727-1478
E-mail: rmendoza@nexsenpruet.com

If to a Borrower:

_____
_____
_____
Attn: _____

Telephone:  (___) ___-____
Facsimile:  (___) ___-____


with a copy (that shall not be effective for notice purposes) to:

G. William McCarthy, Jr., Esq.
1517 Laurel Street (29201)
PO Box 11332
Columbia, SC 29211-1332


Telephone:  (803) 771-8836
Facsimile:  (803) 753-6960
E-mail: bmccarthy@mccarthy-lawfirm.com


9.5    <u>Governing Law</u>.  This Agreement and the other Post-Petition Loan Documents shall be deemed contracts made under the laws of the State of South Carolina and shall be governed by and construed in accordance with the laws of the State of South Carolina (excluding its conflict of laws provisions if such provisions would require application of the laws of another jurisdiction) except insofar as (a) the laws of another jurisdiction may, by reason of mandatory provisions of law, govern the perfection, priority, or enforcement of security interests in the Collateral or (b) the terms of such Post-Petition Loan Document expressly state that the law of a different jurisdiction shall govern and, to the extent applicable, the Bankruptcy Code.

9.6    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and shall inure to the benefit of each Borrower and Lender and their respective successors and assigns; provided, that (a) no Borrower may assign any of its rights hereunder without the prior written consent of Lender, and any such assignment made without such consent will be void in all respects and (b) neither this Agreement nor any of the other Post-Petition Loan Documents

**EXHIBIT  A**

shall inure to the benefit of any trustee appointed in the Chapter 11 Cases or any Chapter 7 case of Borrowers without Lender's express written consent.

9.7     Counterparts; Facsimile Signatures.   This Agreement and any amendments, waivers, or consents relating hereto may be executed in any number of counterparts and by different parties hereto or thereto in separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which when taken together shall constitute but one and the same instrument. Any signature delivered by a party hereto or to any amendment, waiver, or consent relating hereto by facsimile transmission or by electronic email in Adobe Corporation's Portable Document Format (or PDF) shall be deemed to be an original signature hereto.

9.8     No Usury.   Regardless of any other provision of this Agreement, any Note, or in any other Post-Petition Loan Document, if for any reason the effective rate of interest payable hereunder or thereunder should exceed the maximum lawful rate of interest, the effective rate of interest shall be deemed reduced to, and shall be, such maximum lawful rate of interest. Any amount paid or collected by Lender as interest which would be in excess of the amount permitted by applicable law shall be deemed applied to the reduction of the principal balance of the Obligations and not to the payment of interest, but if such Obligations have been or are thereby paid in full, the excess shall be returned to the Person paying same, such application to the principal balance of the Obligations or the refunding of excess to be a complete settlement and acquittance thereof.

9.9     Powers.   All powers of attorney granted to Lender are coupled with an interest and are irrevocable.

9.10    Approvals; Amendments.   If this Agreement calls for Lender's approval or consent, such approval or consent may be given or withheld in the reasonable discretion of Lender unless otherwise specified herein. This Agreement and the other Post-Petition Loan Documents may not be modified, altered, or amended, except by an agreement in writing signed by Borrowers and Lender.

9.11    Dealings with Multiple Borrowers.   All Obligations, representations, warranties, and covenants set forth in the Post-Petition Loan Documents to which a Borrower is a party shall be joint and several.

9.12    Borrower's Failure to Act.   No right of Lender or any other present or future holders of any of the Obligations to enforce the subordination provisions herein shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Borrower or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by any Borrower with the terms hereof, regardless of any knowledge thereof which any such holder may have or be otherwise charged with.

9.13

9.14    Additional Provisions.   Time is of the essence of this Agreement and the other Post-Petition Loan Documents. No provision of this Agreement or any of the other Post-Petition Loan Documents shall be construed against or interpreted to the disadvantage of any

**EXHIBIT A**

party hereto by any Governmental Entity by reason of such party having or being deemed to have structured, drafted or dictated such provision.

9.15   Integration; Final Agreement.  This Agreement and the other Post-Petition Loan Documents, together with all other instruments, agreements, and certificates executed by the parties in connection therewith or with reference thereto, embody the entire understanding and agreement between the parties hereto and thereto with respect to the subject matter hereof and thereof and supersede all prior agreements, understandings and inducements, whether express or implied, oral or written. There are no unwritten oral agreements between the parties.

9.16   LIMITATION ON LIABILITY; WAIVER OF PUNITIVE DAMAGES. EACH OF THE PARTIES HERETO, INCLUDING LENDER BY ACCEPTANCE HEREOF, AGREES THAT IN ANY JUDICIAL, MEDIATION, OR ARBITRATION PROCEEDING OR ANY CLAIM OR CONTROVERSY BETWEEN OR AMONG THEM (A "DISPUTE") THAT MAY ARISE OUT OF OR BE IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE POST-PETITION LOAN DOCUMENTS, OR ANY OTHER AGREEMENT OR DOCUMENT BETWEEN OR AMONG THEM OR THE OBLIGATIONS EVIDENCED HEREBY OR RELATED HERETO, IN NO EVENT SHALL ANY PARTY HAVE A REMEDY OF, OR BE LIABLE TO THE OTHER FOR, (a) INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGES OR (b) PUNITIVE OR EXEMPLARY DAMAGES. EACH OF THE PARTIES HEREBY EXPRESSLY WAIVES ANY RIGHT OR CLAIM TO PUNITIVE OR EXEMPLARY DAMAGES THEY MAY HAVE OR WHICH MAY ARISE IN THE FUTURE IN CONNECTION WITH ANY DISPUTE, REGARDLESS OF WHETHER THE DISPUTE IS RESOLVED BY ARBITRATION, MEDIATION, JUDICIALLY, OR OTHERWISE.

9.17   WAIVER OF JURY TRIAL.   TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH BORROWER, BY EXECUTION HEREOF, AND LENDER, BY ACCEPTANCE HEREOF, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE POST-PETITION LOAN DOCUMENTS OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO ENTER INTO AND ACCEPT THIS AGREEMENT.  EACH OF THE PARTIES AGREES THAT THE TERMS HEREOF SHALL SUPERSEDE AND REPLACE ANY PRIOR AGREEMENT RELATED TO ARBITRATION OF DISPUTES BETWEEN THE PARTIES CONTAINED IN ANY POST-PETITION LOAN DOCUMENT OR ANY OTHER DOCUMENT OR AGREEMENT HERETOFORE EXECUTED IN CONNECTION WITH, RELATED TO OR BEING REPLACED, SUPPLEMENTED, EXTENDED OR MODIFIED BY, THIS AGREEMENT.

9.18   Submission to Jurisdiction; Venue.

EXHIBIT  A

(a)     Any legal action or proceeding with respect to this Agreement or any other Post-Petition Loan Document shall be brought in the Bankruptcy Court, and, by execution and delivery of this Agreement, each Borrower irrevocably accepts for itself and in respect of its property, generally and unconditionally, the nonexclusive jurisdiction of the Bankruptcy Court, and agrees to be bound by the other provisions set forth in this Section 9.18. Each Borrower further irrevocably consents to the service of process out of any of the Bankruptcy Court in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to it at the address set out for notices pursuant to Section 9.4, such service to become effective 3 days after such mailing. Nothing herein shall affect the right of the Parties to serve process in any other manner permitted by law or to commence legal proceedings or to otherwise proceed against one another in any other jurisdiction,

(b)     Each Borrower hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement or any other Post-Petition Loan Document brought in the Bankruptcy Court referred to in subsection (a) above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

(c)     Notwithstanding the foregoing, if the Chapter 11 Case is dismissed or Lender obtains relief from the automatic stay or is otherwise authorized to enforce its remedies hereunder or under applicable law while any Event of Default exists, the reference to the term "Bankruptcy Court" as used in this Section 9.18 shall be expanded to include any state or federal court of competent jurisdiction located in South Carolina as elected by Lender in its discretion.

9.19    Credit Inquiries.  Each Borrower hereby authorizes and permits Lender, at its discretion and without any obligation to do so, to respond to credit inquiries from third parties concerning any Borrower or any of its Subsidiaries.

9.20    Information.  Nothing in this Agreement shall prevent Lender from disclosing confidential information provided by any Borrower from time to time (a) to the Bankruptcy Court, any Committee, any of Lender's Affiliates, or any of Lender's or any of its Affiliates' officers, directors, employees, agents, or advisors, (b) to any other Person if reasonably incidental to the administration of the agreements made herein, (c) as required by any law, rule, or regulation, (d) upon the order, request or demand of any Governmental Entity; provided, however, that, to the extent permitted by law, Lender shall provide prior written notice to the affected Borrower of any such request or demand, (e) that is or becomes available to the public or that is or becomes available to Lender other than as a result of a disclosure by Lender prohibited by this Agreement, (f) in connection with any litigation to which Lender or any of its Affiliates may be a party, whether to defend itself, reduce its liability, protect or exercise any of its claims, rights, remedies or interests under or in connection with the Post-Petition Loan Documents, or otherwise, (g) to the extent necessary in connection with the exercise of any remedy under this Agreement or any other Post-Petition Loan Document and (h) to any actual or proposed participant or assignee; such information to consist of deal terms and other information customarily found in such publications. Each Borrower hereby authorizes Lender to use the name, logos and other insignia and the amount of the credit facility provided

**EXHIBIT  A**

hereunder in any "tombstone" or comparable advertising, on its website or in other of Lender's marketing materials.

      9.21   <u>No Tax Advice</u>.  Each Borrower hereby acknowledges and agrees that, with respect to all tax and accounting matters relating to this Agreement, the other Post-Petition Loan Documents, or the transactions contemplated herein and therein, it has not relied on any representations made, consultation provided by, or advice given or rendered by Lender or Lender's representatives, agents, or employees, and, instead, each Borrower has sought, and relied upon, the advice of its own tax and accounting professionals with respect to all such matters.

**EXHIBIT  A**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed under seal as of the day and year first above written.

ASHLEY I, LLC


By: Prodel, LLC
     Manager


By: _____
     Craig A. Briner, Manager


[SEAL]


ASHLEY II, LLC


By: Prodel, LLC
     Manager


By:_____
     Craig A. Briner, Manager

[SEAL]


]

Accepted in Charleston, South Carolina

MAGNOLIA/ARC LENDER, LLC, a South Carolina limited  company


By: MWV-MAGNOLIA/ARC I, LLC
     A Delaware limited liability company

Its:  Authorized Director

     By: _____
       Kenneth T. Seeger
       President and Chief Executive Officer

**EXHIBIT  A**

**Schedule I**

## Defined Terms

Capitalized terms that are not otherwise defined in the Agreement shall have the meanings set forth below:

"Administrative Claim" means any Claim of a Person that is entitled in any of the Chapter 11 Cases to priority treatment under section 503(b) of the Bankruptcy Code.

"Advance" means the cash proceeds of the Post-Petition Loan which the Lender advances to, or for the benefit of, Borrowers, as principal disbursement under the Post-Petition Loan, all subject to and in accordance with the provisions of this Agreement.

"Advance Request" means a request for an Advance under the Post-Petition Loan in accordance with Section 2 utilizing such form of request as approved by Lender.

"Agreement" has the meaning given to such term in the preamble hereto.

"Affiliate" has the meanings prescribed to the terms "Affiliate" by 11 U.S.C. §101(2)(A) and the term "Insider" 11 U.S.C. §101(31).

"Avoidance Claim" means any claim that could be asserted by or on behalf of the Borrowers or the Estate against a Person under 11 U.S.C. §§ 502(b), 544, 545, 546, 547, 548, 549, 550, 551 or 553.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of South Carolina.

"Borrowers" has the meaning given such term in the preamble of this Agreement.

"Base Rate" means four and one-half percent (4.5%) per annum.

"Business Day" means (a) any weekday on which Lender is open for business in Charleston, South Carolina.

"Carve-Out" shall have the meaning given to it in the Interim Financing Order (or, when

**EXHIBIT  A**

applicable, the Final Financing Order).

"Chapter 11 Cases" shall have the meaning assigned to such term in the Recitals.

"Claims" shall have the meaning proscribed by 11 U.S.C. §101(5).

"Closing Date" means the date on which Lender first makes an Advance under the Post-Petition Loan.

"Collateral" means the following property of each Borrower, wherever located and whether now owned by such Borrower or hereafter acquired, including but not limited to (a) all Real Property and all Fixtures located at or affixed to the Real Property (b) all Deposit Accounts and funds on deposit therein, and funds otherwise on deposit under the Control of Lender or its agents or correspondents; ;and (c) all proceeds of any of the foregoing (; provided, however, that "Collateral" shall not include Avoidance Claims and any proceeds of property recovered in connection with the successful prosecution or settlement of Avoidance Claims; provided, further, however that if Borrowers grant or consent to any Lien or security interest in Avoidance Claims or any proceeds of property recovered in connection with the successful prosecution or settlement of Avoidance Claims, then such property will become part of the Collateral automatically and without further action.

"Commitment Termination Date" means the earliest to occur of (a) the Maturity Date; (b) the sale of all or substantially all of the assets of Borrowers; (c) the date on which the Borrowers terminate this Agreement and the Post-Petition Loan Commitment pursuant to Section 2.11; (d) the date on which Lender terminates its Post-Petition Loan Commitments pursuant to Section 8.2(a) hereof; (e) the date on which Lender is granted relief from the automatic stay; and (f) the date on which any of the Chapter 11 Cases is dismissed or converted to Chapter 7 of the Bankruptcy Code.

"Committee" means a creditors' or equity security holders' committee appointed in the Chapter 11 Cases by the U.S. Trustee.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person arising from any guaranty, indemnity, or other assurance of payment or performance of any Debt, lease, dividend or other obligation ("primary obligations") of any Person (the "primary obligor") in any manner, whether directly or indirectly, including (i) the direct or indirect guaranty indorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (ii) the obligation to make take-or-pay or similar payments, if required, regardless of non-performance by any other party or parties to an agreement, (iii) any obligation of such Person, whether or not contingent, (A) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for

**EXHIBIT  A**

the purchase or payment of any such primary obligations or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (C) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Control" means, with respect to any asset, right, or property with respect to which a security interest therein is perfected by a secured party's having "control" thereof (whether pursuant to the terms of an agreement or through the existence of certain facts and circumstances), that Lender has "control" of such asset, right, or property in accordance with the terms of Article 9 of the UCC.

"Debt" means, with respect to any Person, all liabilities of such Person as determined under GAAP, irrespective of whether such liabilities are subject to compromise, and all obligations which such Person has guaranteed or indorsed or is otherwise secondarily or jointly liable for, and shall include, without limitation, (a) all obligations for borrowed money or purchased assets; (b) obligations secured by assets whether or not any personal liability exists; (c) the capitalized amount of any capital or finance lease obligations; (d) the unfunded portion of pension or benefit plans or other similar liabilities; (e) obligations as a general partner; (f) Contingent Obligations pursuant to guaranties of obligations that constitute Debt, indorsements (other than indorsements of Instruments in the ordinary course of business for purposes of collection), letters of credit and other secondary liabilities, whether incurred directly, secondarily, or jointly; and (g) obligations for deposits.

"Default" means any event or circumstance which, upon satisfaction of any requirement for the giving of notice or the lapse of time would constitute an Event of Default.

"Default Rate" means, as of any date, a rate per annum that is equal to (a) in the case of the principal amount of the Post-Petition Loan outstanding on such date, 2.00% in excess of the Base Rate applicable to the Post-Petition Loan (or portion thereof) on such date.

"Dollars" or "$" means United States dollars.

"Equity Interest" means, with respect to any Person, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interest in (however designated) equity of such Person, including, without limitation, any common stock, preferred stock, limited or general partnership interests, and limited liability company membership

EXHIBIT  A

interests, whether voting or non-voting.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Estate" means, with respect to each Borrower, the estate created in the Chapter 11 Case pursuant to 11 U.S.C. § 541(a).

"Event of Default" has the meaning given such term in Section 8.1.

 "Final Financing Order" means an order which is entered by the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c) on motion by Borrowers, which order is in form and substance reasonably acceptable to Lender in all respects, authorizes the incurrence by Borrowers of post-petition secured and superpriority Debt under the Post-Petition Loan Facility in accordance with the Post-Petition Loan Documents, and has not been vacated, revised, modified, amended or stayed..

 "Financing Orders" means, collectively, the Interim Financing Order and the Final Financing Order.

 "Full Payment" means, with respect to the Obligations the full and indefeasible cash payment thereof, including any interest, fees and other charges accruing during the pendency of the Chapter 11 Cases or any other Insolvency Proceeding (whether or not allowed in any such Insolvency Proceeding). The Obligations shall not be deemed to have been paid in full until the Post-Petition Loan Facility (and the Post-Petition Loan Commitment thereunder) has expired or been terminated.

 "GAAP" means generally accepted accounting principles as in effect in the United States from time to time,

 "Governmental Entity" means any (a) court (whether in law or at equity or trial or appellate), tribunal, or arbitrator or arbitration proceeding and (b) any local, city, state, federal, municipal or quasi-municipal, foreign, or international government or any subdivision, agency, authority, commission, bureau, branch, regulatory body, or other body thereof.

 "Insolvency Proceeding" means any action, case or proceeding commenced by or against a Person, or any agreement of such Person, for (a) the entry of an order for relief under any chapter of the Bankruptcy Code or other insolvency or debt adjustment law (whether state, federal or foreign), (b) the appointment of a receiver, trustee, liquidator or other custodian for such Person or any part of its property, (c) an assignment or trust mortgage for the benefit of creditors of such Person, or (d) the liquidation, dissolution or winding up of the affairs of such Person.

 "Interim Financing Order" means an order which is entered by the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c) on motion by Borrowers, which order is in form and substance reasonably acceptable to Lender in all respects, authorizes the incurrence by Borrowers, during the Interim Period, of post-petition secured and superpriority Debt under the Post-Petition Loan Facility in accordance with the Post-Petition Loan Documents, and has not been vacated, reversed, modified, amended or stayed.

**EXHIBIT  A**

"Interim Period" means the period commencing upon the entry of the Interim Financing Order and ending upon the entry of the Final Financing Order.

"Jurisdiction" means the Bankruptcy Court.

"Lender Professionals" means attorneys, accountants, appraisers, business valuation experts, environmental engineers or consultants, turnaround consultants and other professionals or experts at any time retained by Lender.

"Lien" means any lien (statutory or otherwise), mortgage, deed of trust, deed to secure debt, pledge, hypothecation, security interest, trust arrangement, security deed, financing lease, collateral assignment, encumbrance, conditional sale or title retention agreement, or any other interest in property designed to secure the repayment or performance of any obligation, whether arising by agreement or under any statute or law or otherwise.

"Loss" has the meaning given such term in Section 6.3.

"Material Adverse Effect" means any (a) material adverse effect upon the validity, performance, or enforceability of any of the Post-Petition Loan Documents or any of the transactions contemplated hereby or thereby; (b) material adverse effect upon the properties, business, prospects, or condition (financial or otherwise) of any Borrower; (c) material adverse effect upon the ability of any Borrower to fulfill any obligation under any of the Post-Petition Loan Documents; or (d) material adverse effect on the Collateral.

"Maturity Date" means December 31, 2016.

"Moody's" means Moody's Investors Services, Inc.

"Mortgaged Real Property" means all real property over which Lender has been granted a post-petition Lien pursuant to the terms of the Financing Order.

"OFAC" means the United States Department of the Treasury's Office of Foreign Assets Control or any successor thereto,

"Obligations" means all indebtedness, obligations and liabilities at any time incurred by any Borrower to Lender after the Petition Date (other than interest, fees or other charges accruing with respect to the Pre-Petition Debt), whether related or unrelated to the Post-Petition Loan or the Post-Petition Loan Documents, including, without duplication, (a) amounts owed or to be owed under the terms of this Agreement and the other Post-Petition Loan Documents, or arising out of the transactions described herein or therein, (b) the Post-Petition Loan, (c) amounts paid by Lender under, and other obligations of any Borrower, and (d), all fees, costs of collection and expenses of Lender Professionals (including reasonable attorneys' fees) and other expenses paid or incurred by Lender (i) in discharge of any Obligations of any Borrower, (ii) to inspect, repossess, remove, transport, deliver, protect, preserve, complete, store, sell or otherwise dispose of any Collateral, (iii) in connection with the documentation and closing of the transactions described herein and any amendments to or waivers of any of the Post-Petition Loan Documents, (iv) in connection with the appointment and administration of any receiver or (v) in connection with the monitoring of or appearance in the Chapter 11 Cases or any superseding Chapter 7

26

**EXHIBIT  A**

cases, together with  in each of the foregoing cases in this definition, all interest accruing thereon, and whether any of the foregoing amounts are now due or hereafter become due, are direct or indirect, or are certain or contingent, and whether such amounts due are from time to time reduced or entirely extinguished and thereafter re-incurred.

"Obligor" means Borrowers and any other Person that is at any time liable for any payment of the whole of any part of the Obligations or that has granted in favor of Lender a Lien upon any of such Person's assets to secure payment of any of the Obligations.

"Permitted Debt" has the meaning set forth in Section 7.1 hereof.

"Permitted Senior Lien" means a Lien upon any of the Collateral which (i) pursuant to the express terms of the Financing Orders is senior in priority to the Liens granted in favor of Lender under the Post-Petition Loan Documents and the Financing Orders or (ii) constitutes a perfected and unavoidable Lien for property taxes that (to the extent accruing after the Petition Date) are not yet due and payable if under applicable law such Lien is entitled to priority over all other Liens (regardless of time of creation, filing or recording) (unless Properly Contested).

"Person" means any natural person, corporation, unincorporated organization, trust, joint-stock company, joint venture, association, company, limited or general partnership, limited liability company, any government or any agency or political subdivision of any government, or any other entity or organization.

"Petition Date" means February 8, 2016.

"Post-Petition Loan" means the Post-Petition Loan to be made by Lender to Borrowers pursuant to Section 2.

"Post-Petition Loan Commitment" means, on any date, the commitment of Lender, in the Support Agreement subject to the terms and conditions herein, to make the Post-Petition Loan in accordance with and subject to the provisions of Section 2 in an aggregate amount not to exceed Four Hundred Seventy-five Thousand Dollars ($475,000.00).

"Post-Petition Loan Documents" means this Agreement and each other now existing or hereafter arising document, agreement, or instrument evidencing, describing, guaranteeing, or securing the Obligations or delivered in connection with this Agreement, including without limitation the Post-Petition Note, each Security Agreement,  and UCC financing statements.

"Post-Petition Loan Facility" means the credit facility established by Lender in favor of Borrowers under Section 2 of this Agreement and pursuant to which the Post-Petition Loan Commitment is made available by Lender.

"Post-Petition Loan Motion" means the motion of Borrowers filed with the Bankruptcy Court in the Chapter 11 Cases seeking approval of the financing under the Post-Petition Loan Facility pursuant to this Agreement.

**EXHIBIT  A**

"Post-Petition Loan Term" means the period from and including the Closing Date to (but not including) the Commitment Termination Date.

"Post-Petition Note" has the meaning set forth in Section 2.3 and any other promissory note now or hereafter evidencing any Obligations, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

"Pre-Petition Debt" means all Debts and other obligations of Borrowers or any other Obligor to Lender on the Petition Date under any of the Pre-Petition Loan Documents, whether direct or indirect, absolute or contingent or due or to become due, including all interest thereon accruing prior to or after the Petition Date and all legal fees and collection expenses heretofore or hereafter incurred in collecting any of such indebtedness.

"Pre-Petition Lender" means the lender who provided the Pre-Petition Debt to the Borrowers.

"Pre-Petition Loan Documents" means any agreements, pledges, guaranties, assignments and other documents executed in connection therewith or with reference thereto or to evidence or secure payment of the whole or any part of the Pre-Petition Debt, described in Exhibit D attached hereto.

"Professional Expenses" means the fees and reimbursable expenses of a Professional Person.

"Professional Person" means a Person who is an attorney, accountant, appraiser, auctioneer or other professional person and who is retained, with Bankruptcy Court approval, by (i) Borrowers pursuant to Section 327 of the Bankruptcy Code or (ii) a Committee pursuant to Section 1103(a) of the Bankruptcy Code.

"Properly Contested" means, in the case of any Debt of any Borrower (including any taxes) which is not paid when due or payable by reason of such Borrower's bona fide dispute over its liability therefor or the amount thereof, (a) such Debt is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (b) such Borrower has established appropriate reserves in accordance with GAAP; (c) the non-payment of such Debt will not result in a forfeiture or sale of any of such Borrower's assets; (d) no Lien is imposed upon any of such Borrower's assets with respect to such Debt unless such Lien is at all times subordinate in priority to the Liens in favor of Lender (except only with respect to property taxes that have priority as a matter of applicable law) or enforcement of such Lien is stayed pending the final resolution or disposition of such dispute; (e) if the Debt results from, or is determined by the entry, rendition, or issuance against such Borrower or any of its assets of a judgment, writ, order, or decree, enforcement of such judgment, writ, order, or decree is stayed pending a timely appeal or other judicial review; and (f) if such contest is abandoned, settled, or determined adversely (in whole or in part) to such Borrower, such Borrower forthwith pays such Debt and all penalties, interest, and other amounts due in connection therewith. Only that portion of the Debt which is in dispute may be Properly Contested.

"Real Property" means all right, title and interest of a Borrower (whether as owner, lessor or lessee) at any time or times held by such Borrower, including without limitation all

**EXHIBIT  A**

improvements, trees, riparian rights, easements, rights-of-way, water rights, oil, gas and mineral rights, air rights, privileges, interests and appurtenances and other rights pertaining to the Property; any land lying in the bed of any street, road, alley or avenue opened or proposed, public or private, in front of or adjoining the Property; any award made or to be made in lieu thereof; any unpaid award for damage to the Property by reason of change of grade of any street: and any strips and gores adjoining or adjacent to the Property; pre-paid taxes, pre-paid impact fees, and hook-up fees, if any; preliminary and final plats, site plans, surveys, soil tests, engineering plans and studies related to the Property; and to the extent assignable or transferable, all other intangible property and intangible property rights owned by such Borrower in connection with any such real property, including, without limitation, all licenses, permits and approvals issued to or held by or for the benefit of such real property, and all approvals from all Governmental Entities obtained by or on behalf of such Borrower for such real property.

"Restricted Payment" means (a) any dividend or other distribution, direct or indirect and whether cash or other property, on account of any Equity Interests issued by any Borrower or any of its Subsidiaries, as the case may be, now or hereafter outstanding, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interests issued by any Borrower or any of its Subsidiaries now or hereafter outstanding by any Borrower or any of its Subsidiaries, as the case may be, except for any redemption, retirement, sinking funds or similar payment payable solely in such other shares or units of the same class of Equity interests or any class of Equity Interests which are junior to that class of Equity Interests, or (c) any cash payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire any Equity Interests issued by any Borrower or any of its Subsidiaries now or hereafter outstanding.

"Sanctioned Country" means a country subject to the sanctions program identified on the list maintained by OFAC and available at the following website or as otherwise published from time to time: http://www.treas.gov/offices/enforcement/ofac/programs/.

"Sanctioned Person" means (a) any Person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC available at http://www.treas.gov/offiices/eotff/ofac/sdn/index.html or as otherwise published from time to time, (b) any agency, authority, or subdivision of the government of a Sanctioned Country, (c) any Person or organization controlled by a Sanctioned Country, or (d) any Person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC.

"Secured Claim" means a Claim against a Borrower in the Chapter 11 Case of such Borrower that arose prior to the Petition Date and that is secured by a Lien upon any asset of such Borrower in existence on the Petition Date.

"Security Agreement" means this Agreement as it relates to a security interest in the Collateral, and any other mortgage instrument, deed of trust, life insurance assignment, security agreement, or similar agreement or instrument now or hereafter executed by any Borrower or other Person granting Lender a Lien in any property to secure the Obligations.

**EXHIBIT  A**

"Senior Officer" means, as to any Borrower, the chief executive officer, chief financial officer, chief legal officer, manager (with respect to any manager-managed limited liability company), or president of such Borrower.

"Solvent" means, as to any Person, that such Person has capital sufficient to carry on its business and transactions in which it is currently engaged and all business and transactions in which it is about to engage, is able to pay its Debts as they mature, and has assets having a value greater than its liabilities, at fair valuation.

"Subsidiary" means, as to any Person, any other Person of which more than 50% of the Equity Interests issued by such other Person are directly or indirectly owned or effectively controlled by such Person.

"Support Agreement" shall have the meaning assigned to it in the Recitals hereto.

"Taxes" means any present or future taxes, levies, imposts, duties, fees, assessments, deductions, withholdings or other charges of whatever nature, including income, receipts, excise, property, sales, use, transfer, license, payroll, withholding, social security and franchise taxes now or hereafter imposed or levied by the United States, or any state, local or foreign government or by any department, agency or other political subdivision or taxing authority thereof or therein and all interest, penalties, additions to tax and similar liabilities with respect thereto, but excluding, in the case of Lender, taxes imposed on or measured by the net income or overall gross receipts of Lender.

"Third Party" means (a) any lessor, mortgagee, mechanic or repairman, warehouse operator, freight forwarder, customs broker, processor, packager, or other third party which may have possession of any Collateral or lienholders' enforcement rights against any Collateral or (b) any licensor whose rights in or with respect to any intellectual property or Collateral limit or restrict or may, in Lender's determination, limit or restrict any Borrower's or Lender's right to sell or otherwise dispose of such Collateral.

"Third Party Agreement" means an agreement in form and substance reasonably satisfactory to Lender pursuant to which a Third Party, as applicable and as required by Lender, waives or subordinates in favor of Lender, or otherwise provides terms acceptable to Lender regarding, such Third Party's lienholders' enforcement rights against any Collateral, grants Lender access to the Collateral for purposes of allowing Lender to exercise its rights hereunder and under the other Post-Petition Loan Documents, or authorizes Lender to dispose of Collateral bearing or consisting of, in whole or in part, such Third Party's intellectual property.

"UCC" means the Uniform Commercial Code (or any successor statute), as adopted and in force in the Jurisdiction or, when the laws of any other state govern the method or manner of the perfection or enforcement of any Lien in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such other state.

"U.S." means the United States of America.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001,

**EXHIBIT A**

as the same may be amended, restated, supplemented, or otherwise modified from time to time.

**EXHIBIT  A**

**Exhibit A**

**Form of Post-Petition Note**

**[Attached Below]**

**EXHIBIT  A**

## POST-PETITION NOTE

$475,000.00                                          February ___, 2016
                                             Charleston, South Carolina


      FOR VALUE RECEIVED, the undersigned **ASHLEY I, LLC**, a South Carolina limited liability company, and **ASHLEY II of CHARLESTON, LLC**, a South Carolina limited liability company ("collectively, "**Borrower**"), jointly and severally unconditionally promise to pay to the order of **MAGNOLIA/ARC LENDER, LLC**, a South Carolina limited liability company ("**Lender**"), in accordance with that certain Post-Petition Loan Agreement, dated as of February __, 2016, among Borrowers and Lender (the "**Post-Petition Loan Agreement**"), the principal amount of $475,000.00 or the then unpaid principal amount of Advances by Lender to Borrowers pursuant to the Post-Petition Loan Agreement, whichever is less. Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Post-Petition Loan Agreement.

      Borrowers further unconditionally promises to pay to Lender interest on the unpaid principal amount of the Post-Petition Loan until paid at the rate or rates per annum, from the dates and payable on the dates set forth in the Post-Petition Loan Agreement.

      This Post-Petition Note (this "Post-Petition Note") is the promissory note referred to in Section 2.3 of the Post-Petition Loan Agreement. This Post-Petition Note is given subject to the provisions of the Post-Petition Loan Agreement.  In case an Event of Default shall occur and be continuing, the principal of and accrued interest on this Post-Petition Note may be declared to be due and payable in the manner and with the effect provided in the Post-Petition Loan Agreement.

      Borrowers hereby waive presentment, demand, protest or notice of any kind in connection with this Post-Petition Note.

      THIS POST-PETITION NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF SOUTH CAROLINA.


[Signature Page Follows]


**EXHIBIT  A**

IN WITNESS WHEREOF, the Borrowers have caused this Post-Petition Note to be duly executed under seal to be effective as of the day and year first above written.

**ASHLEY I, LLC**, a South Carolina limited liability company

By: Prodel, LLC
Its Manager

     By: _____
     Name:  Craig A. Briner
     Title: Manager

[SEAL]

**ASHLEY II of CHARLESTON, LLC**, a South Carolina limited liability company

By: Prodel, LLC
Its Manager

     By: _____
     Name:  Craig A. Briner
     Title: Manager
:

[SEAL]

EXHIBIT  A

## Exhibit B

### Pre-Petition Loan Documents

Loan Agreement dated as of July 28, 2004, as extended and amended as of March 20, 2007, August 3, 2007, November 7, 2007 and December 19, 2008 (as so amended, the "**Loan Agreement**"); that certain Promissory Note dated July 28, 2004 given to Bank of America in connection with the Loan, as amended on March 20, 2007, on August 3, 2007 and on November 7, 2007 (as amended, the "**Note**"); that certain Mortgage, Assignment, Security Agreement and Fixture Filing dated July 28, 2004 from Ashley II to Bank of America, as amended on August 3, 2007, on November 7, 2007 and on December 19, 2008 (as amended, the "**Ashley II 2004 Mortgage**"), which mortgage and amendments are recorded in the Office of the Register of Deeds for Charleston County, South Carolina; that certain Mortgage, Assignment, Security Agreement and Fixture Filing dated December 3, 2012 from Ashely II to Bank of America (the "**Ashley II 2012 Mortgage**"); that certain Mortgage, Assignment, Security Agreement and Fixture Filing dated November 7, 2007 from Ashley I to Bank of America (the "**Ashley I Mortgage**"); those certain UCC financing (the "**UCC Financing Statements**") statements filed with the South Carolina Secretary of State and with Charleston County, South Carolina to perfect the security interests in the Debtors' assets granted to Bank of America to secure the Loan, which is now held by Lender; that certain Assignment of Contracts, Licenses and Permits dated July 28, 2004 from Ashley II to Bank of America, as amended on August 3, 2007 and on November 7, 2007 (as amended, the "**Ashley II Assignment of Contracts, Leases and Permits**"); that certain Assignment of Contracts, Licenses and Permits dated November 7, 2007 from Ashley I to Bank of America (the "**Ashley I Assignment of Contracts, Licenses and Permits**"); that certain Assignment and Subordination of Management Agreement dated August 3, 2007 among Ashley II, Bank of America and Magnolia Development, LLC, as amended on November 7, 2007 (as amended, the "**Ashley II Assignment and Subordination of Management Agreement**"); that certain Assignment and Subordination of Management Agreement dated November 7, 2007 among Ashley I, Bank of America and Magnolia Development, LLC (the "**Ashley I Assignment and Subordination Agreement**"); that certain Assignment of Security Documents dated as of December 3, 2012 and recorded in Charleston County, South Carolina on December 4, 2012, by which Bank of America recorded its assignment of the Loan security documents to Magnolia/ARC, L.P., which Magnolia/ARC, L.P. subsequently assigned to Lender on April 2, 2013 by the Assignment of Security Documents recorded in Charleston County, South Carolina on April 3, 2013; and that certain Allonge dated December 3, 2012 by which Magnolia/ARC, L.P. succeeded to Bank of America's rights and interests under the Note, and that certain Allonge executed on April 2, 2013 by which Magnolia/ARC, L.P. transferred the rights under the Note to Lender; all of which foregoing documents are collectively referred to as the "**Pre-Petition Loan Documents**

EXHIBIT  A