## SUPPORT AGREEMENT

This <u>Support Agreement</u> (the "**Agreement**") is made effective as of February 4, 2016, by and among Ashley I, LLC ("**Ashley I**"), Ashley II of Charleston, LLC ("**Ashley II**", and together with Ashley I, the "**Debtors**") and Magnolia/ARC Lender, LLC ("**Lender**"), each of which is a "**Party**" and collectively are the "**Parties**" to this Agreement.

## RECITALS

WHEREAS, the Debtors are parties with Lender, as successor in interest to Bank of America, N.A. ("**Bank of America**"), to a loan (the "**Loan**") having a current balance in the approximate amount of $18.5 million, which is secured by a first mortgage on real property owned by Ashley I, a first mortgage on real property owned by Ashley II (collectively the "**Mortgaged Property**"), and security interests in and assignments of other assets owned by the Debtors; and

WHEREAS, the Loan is evidenced by that certain <u>Loan Agreement</u> dated as of July 28, 2004, as extended and amended as of March 20, 2007, August 3, 2007, November 7, 2007 and December 19, 2008 (as so amended, the "**Loan Agreement**"); that certain <u>Promissory Note</u> dated July 28, 2004 given to Bank of America in connection with the Loan, as amended on March 20, 2007, on August 3, 2007 and on November 7, 2007 (as amended, the "**Note**"); that certain <u>Mortgage, Assignment, Security Agreement and Fixture Filing</u> dated July 28, 2004 from Ashley II to Bank of America, as amended on August 3, 2007, on November 7, 2007 and on December 19, 2008 (as amended, the "**Ashley II 2004 Mortgage**"), which mortgage and amendments are recorded in the Office of the Register of Deeds for Charleston County, South Carolina; that certain <u>Mortgage, Assignment, Security Agreement and Fixture Filing</u> dated December 3, 2012 from Ashely II to Bank of America (the "**Ashley II 2012 Mortgage**"); that certain <u>Mortgage, Assignment, Security Agreement and Fixture Filing</u> dated November 7, 2007 from Ashley I to Bank of America (the "**Ashley I Mortgage**"); those certain UCC financing (the "**UCC Financing Statements**") statements filed with the South Carolina Secretary of State and with Charleston County, South Carolina to perfect the security interests in the Debtors' assets granted to Bank of America to secure the Loan, which is now held by Lender; that certain <u>Assignment of Contracts, Licenses and Permits</u> dated July 28, 2004 from Ashley II to Bank of America, as amended on August 3, 2007 and on November 7, 2007 (as amended, the "**Ashley II Assignment of Contracts, Leases and Permits**"); that certain <u>Assignment of Contracts, Licenses and Permits</u> dated November 7, 2007 from Ashley I to Bank of America (the "**Ashley I Assignment of Contracts, Licenses and Permits**"); that certain <u>Assignment and Subordination of Management Agreement</u> dated August 3, 2007 among Ashley II, Bank of America and Magnolia Development, LLC, as amended on November 7, 2007 (as amended, the "**Ashley II Assignment and Subordination of Management Agreement**"); that certain <u>Assignment and Subordination of Management Agreement</u> dated November 7, 2007 among Ashley I, Bank of America and Magnolia Development, LLC (the "**Ashley I Assignment and Subordination Agreement**"); that certain <u>Assignment of Security Documents</u> dated as of December 3, 2012 and recorded in Charleston County, South Carolina on December 4, 2012, by which Bank of America recorded its assignment of the Loan security documents to Magnolia/ARC, L.P., which

EXHIBIT B

Magnolia/ARC, L.P. subsequently assigned to Lender on April 2, 2013 by the <u>Assignment of Security Documents</u> recorded in Charleston County, South Carolina on April 3, 2013; and that certain <u>Allonge</u> dated December 3, 2012 by which Magnolia/ARC, L.P. succeeded to Bank of America's rights and interests under the Note, and that certain <u>Allonge</u> executed on April 2, 2013 by which Magnolia/ARC, L.P. transferred the rights under the Note to Lender; all of which foregoing documents are collectively referred to as the "**Loan Documents**;" and

WHEREAS, the Loan is in default, the Debtors are unable to pay Lender the indebtedness due upon the Loan and Lender is entitled to exercise its remedies in the Mortgaged Property securing the Loan; and

WHEREAS, portions of the Mortgaged Property securing the Loan contain certain environmental contamination and are subject to remediation requirements, as determined by the United States Environmental Protection Agency (the "**EPA**") and the South Carolina Department of Health and Environmental Control ("**DHEC**"), and the need to address the remediation requirements has prevented the sale of the contaminated property to date; and

WHEREAS, certain companies, including Ashley II, have or may be deemed to have financial responsibility for certain of the costs of testing, analysis and remediation of the contaminated property commonly referred to as the "**Columbia Nitrogen Tract**" (such parties being the "**Responsible Parties**"), pursuant to the provisions of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("**CERCLA**"), 42 U.S.C. § 9601, *et seq.*, the Superfund Amendments and Reauthorization Act of 1986 ("**SARA**"), Public Law No. 99-499, and other environmental laws; and

WHEREAS, there has been substantial litigation among the Responsible Parties relating to their respective financial responsibility and obligations for the remediation and EPA costs associated with the Columbia Nitrogen Tract; such litigation has included asserted liens and interests in property other than the Columbia Nitrogen Tract owned by Ashely II, and assertions regarding the value of Ashley II's property; and the litigation has prevented and now prevents the sale or other disposition which would transfer good and marketable title for much of the property securing the Loan, absent the use of bankruptcy sale process; and

WHEREAS, the Debtors own certain tracts of property collectively known and referred to as the "**Beazer Parcel**," which property requires extensive remediation as a requirement for removal from the CERCLA National Priorities List ("**NPL**"), and the required remediation will entail substantial investment of capital for the removal from the NPL to occur; and

WHEREAS, the Debtors lack funds and resources of their own with which to pay for the costs of maintaining and protecting the Mortgaged Property, for the continuing obligations under agreements with DHEC and the reasonable steps and due care requirements regarding the contamination, and for the costs of defending their interests in the litigation with the Responsible Parties, and Lender agreed to make advances under the Loan to the Debtors to assure the proper maintenance and protection of the Mortgaged Property securing the Loan and to enable the Debtors to defend against claims which might adversely affect Lender's rights in the Mortgaged Property or the marketability of the Mortgaged Property; and

EXHIBIT B

2

WHEREAS, Lender previously entered into an Option Agreement with Ashley River Investors, LLC ("**ARI**") for the eventual sale or transfer of some or all of the Mortgaged Property if Lender forecloses or otherwise obtains title to some or all of the Mortgaged Property, and it is contemplated that Lender may assign all or a portion of its rights under this Agreement to ARI with respect to the possible purchase of Mortgaged Property as set forth hereinbelow; and

WHEREAS, ARI and the Debtors previously entered into a Cooperation Agreement providing ARI certain rights to investigate the condition of the Mortgaged Property, to perform due diligence on the potential for remediation of the Mortgaged Property, and to pursue entitlements for development of the Mortgaged Property; and

WHEREAS, to better state the terms upon which advances are made to the Debtors under the Loan, and to state terms to address the Debtors' indebtedness under the Loan and the disposition of the Mortgaged Property securing the Loan as payment of such indebtedness, in late 2012 and in May 2013 certain Cooperation Agreements were entered among the Debtors, Lender's predecessors in interest and Lender; and

WHEREAS, pursuant to the Cooperation Agreement Lender has the rights, among other rights, to investigate, engage in discussions and negotiate for its own benefit matters affecting the Mortgaged Property securing the Loan, and to receive upon its request deeds in lieu of foreclosure for all or some of the properties securing the Loan, as Lender may choose in its sole discretion, and, in return and in contemplation that all conveyances would be completed, if the Debtors were not in breach of the provisions of the Cooperation Agreements, Lender would release and discharge the Debtors from liability under the Loan on or before May 1, 2017; however, the litigation with the Responsible Parties and the delay of remediation of the Mortgaged Property has prevented the Parties from proceeding with sales or other conveyances of the Mortgaged Property securing the Loan as contemplated, and the Parties recognize that a modification of the release and discharge provision of the Cooperation Agreement is appropriate in light of the time now expected for the Parties to complete the sale and disposition of the Mortgaged Property; and

WHEREAS, pursuant to the Cooperation Agreements, Ashley II also assigned to Magnolia/ARC, L.P. all of Ashley II's rights and interest in that certain judgment it holds against PCS Nitrogen, Inc. ("**PCS**") in the amount of $147,617.02 (plus accrued interest thereon) under the <u>Second Amended Order and Opinion</u> entered on May 27, 2011 and the <u>Second Amended Judgment in a Civil Action</u> entered on May 31, 2011 in *Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.; PCS Nitrogen, Inc., Defendant/Third Party Plaintiff v. Ross Development Corporation, et al.*, Civil Action No. 2:05-cv-2782-MBS in the United States District Court for the District of South Carolina, which Magnolia/ARC, L.P. thereafter assigned to an affiliate of Lender; and

WHEREAS, the Debtors advised Lender that the Debtors were contemplating the filing of bankruptcy cases, and upon consideration of the matters, the Parties agree that an efficient and appropriate way to proceed with the sale of the Mortgaged Property and to enable the remediation of the Beazer Parcel, among other things, is for Ashley I and Ashley II to file cases under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**") and to establish a process for the proper marketing and sale of the

EXHIBIT B

3

Mortgaged Property under Bankruptcy Code §§ 363(b) and (f) and a Chapter 11 plan, which they believe will maximize value for the Debtors, their bankruptcy estates and their creditors; and

WHEREAS, the Debtors will require funding in order to proceed with Chapter 11 cases, both prior to and during the Chapter 11 cases, and they need assurance that a buyer will purchase all or some of the Mortgaged Property owned by the Debtors at a price or upon terms that will provide a source of funds for use in making payments to unsecured creditors; and

WHEREAS, Ashley II previously sold real property that was not under mortgage to Lender, and $337,324.00 of sale proceeds from such sale is now held in escrow in the United States District Court for the District of South Carolina (the "**Ashley II Escrowed Funds**") in connection with certain litigation among Responsible Parties, which funds Ashley II proposes to use for payment of unsecured creditors in a Chapter 11 bankruptcy case; and

WHEREAS, as set forth hereinbelow, in connection with the Debtors' prospective bankruptcy filings, Lender has agreed (1) to provide pre-bankruptcy loan advances to the Debtors to enable them to pay their bankruptcy professionals and to properly prepare documents and filings for their Chapter 11 cases, (2) to provide a post-petition loan to the Debtors for use in funding payment of administrative expenses of the Debtors' bankruptcy estates, (3) to the clarification, modification and amendment of the provisions in the Cooperation Agreements for the release and discharge of the Debtors from indebtedness under the Loan and under the Loan Documents, in recognition of the time now anticipated for the consummation of the sales of the Mortgaged Property, (4) to release and/or reassign the Ashley II judgment against PCS to Ashley II, (5) to make one or more offers to purchase Mortgaged Property securing the Loan which, if approved as the successful bid(s) for such property, will include a cash component for the Debtors' use in making payments to other creditors, and (6) not to assert an interest in the Ashley II Escrowed Funds; and

WHEREAS, as set forth hereinbelow, the Debtors have determined that they will file Chapter 11 cases for the purpose of arranging and effectuating the sale or other disposition of the Mortgaged Property, and, in connection with such filings, they agree (1) to seek approval for sales and a sale process in the Chapter 11 cases as described hereinbelow, (2) to the clarification, modification and amendment of the provisions in the Cooperation Agreements for the release and discharge of the Debtors from indebtedness under the Loan and under the Loan Documents, in recognition of the time now anticipated for the consummation of the sales of the Mortgaged Property, and (3) to pursue approval of the sales provided hereinbelow with reasonable diligence; and

WHEREAS, the Parties have agreed to enter into this Agreement to state their agreed course of action and process, to provide for the funding of the Debtors' expenses in preparing for and filing Chapter 11 cases, and to assure each other of their commitment to proceed in the manner set forth below;

EXHIBIT    B

## TERMS OF AGREEMENT

NOW, THEREFORE, in consideration of the promises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. <u>Chapter 11 Cases</u>. Ashley I and Ashley II each will file a petition for relief under Chapter 11 of the Bankruptcy Code on or about February 5, 2016 in the United States Bankruptcy Court for the District of South Carolina (the "**Bankruptcy Court**"). It is contemplated that the two Chapter 11 cases will be joined for joint administration under Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

2. <u>Prepetition Loan Advances for the Chapter 11 Case Preparation</u>. Lender will make loan advances not to exceed $100,000 to the Debtors for the period prior to the filing of the Debtors' Chapter 11 cases, to cover the prepetition fees and costs of the Debtors' bankruptcy professionals associated with preparing for the Chapter 11 cases. These loan advances are in addition to loan advances made to cover non-bankruptcy expenses of the Debtors that are necessary or appropriate to maintain and/or protect the property securing the Loan, and to protect the Debtors' interests in such property.

3. <u>DIP Loan</u>. Lender will provide post-petition financing to the Debtors in the form of a loan to the Debtors as Chapter 11 debtors-in-possession (the "**DIP Loan**") under 11 U.S.C. §§ 105, 361, 362, 364(c), 364(d), 364(e) and 507(b), subject to authorization by the Bankruptcy Court. The advances to the Debtors under the DIP Loan will not exceed $550,000, which amount includes $75,000.00 for the retainers the Debtors are providing to their bankruptcy professionals, and upon entry of an interim order authorizing the DIP Loan, Lender will advance $150,000 (in addition to the $75,000.00 for the retainers of the Debtors' professionals) to the Debtors as an initial funding, which $150,000 will be held by the Debtors for use consistent with the orders authorizing the DIP Loan. The Parties will submit to the Bankruptcy Court proposed orders authorizing the DIP Loan which provide that (i) the Debtors will be allowed to use the DIP Loan fundings to pay ordinary and customary expenses pursuant to an approved budget, without need to obtain further authorization from the Bankruptcy Court, and (ii) the Debtors will be authorized to pay professional fees and other non-ordinary course of business expenses promptly upon approval of such fees and expenses by the Bankruptcy Court. After the retainers and the initial $150,000 funding under the DIP Loan are used, or if they are insufficient to cover expenses that are due for payment, the Debtors will obtain additional DIP Loan fundings by submitting a written request to Lender. Provided that (a) the requested expenses are reasonably consistent with the approved budget, and (b) the DIP Loan is neither in default nor terminated, Lender will fund the requests up to the aggregate of the $550,000 maximum principal amount of the DIP Loan (which maximum amount includes the $75,000.00 of retainers). The DIP Loan will be provided for, and governed by, the loan documents prepared for it and the orders authorizing it.

4. <u>Bankruptcy Sale of Property</u>. The Debtors will pursue the sale of the Mortgaged Property under the provisions of the Bankruptcy Code, both by motion and as a part of their Chapter 11 plan. As soon as practical, Ashley I and Ashley II will file motions (i) seeking authorization for the sale of all of their real Mortgaged Property except for the Columbia

EXHIBIT B

5

Nitrogen Tract and the parcel commonly referred to as the Van Ness parcel[1] free and clear of all liens, claims, encumbrances and interests other than existing easements and restrictions of record, pursuant to Bankruptcy Code §§ 363(b) and (f), as set forth in paragraph 5 below, and (ii) a motion seeking to establish bidding procedures and certain bid protections for the sale process, with the sale hearing to occur 120 days (or as close to that timeframe as reasonably possible) after the employment of the professional to market the property (as set forth in paragraph 5g below). Ashley II will file similar motions for the sale of the Columbia Nitrogen Tract as soon as practical; however, the Parties recognize that the status of the Columbia Nitrogen Tract, the need to address the EPA lien on it, and the effect of the right given by EPA to PCS to approve any proposed Site Control Plan for that property necessarily require additional time, and it is expected that the motions for the sale of the Columbia Nitrogen Tract will not be filed until later in the Ashley II case. The Debtors' Chapter 11 plan will incorporate the sales consistent with the sale motions.

5.  Bankruptcy Sale Process. The Debtors will seek to obtain orders from the Bankruptcy Court establishing a sale process that provides for the following:

a. The Mortgaged Property owned by Ashley I and all Mortgaged Property owned by Ashley II except for the Columbia Nitrogen Tract and the Van Ness parcel will be sold in one sale (the "**First Sale**") under Bankruptcy Code §§ 363(b) and (f).

b. Pursuant to Bankruptcy Code § 363(f), the sale of the property in the First Sale shall be made free and clear of all liens, claims, encumbrances and interests other than existing easements and restrictions of record.

c. Lender shall have the right to credit bid the secured indebtedness under the Loan for the purchase of property securing the Loan, pursuant to Bankruptcy Code § 363(k).

d. Lender will make an initial bid for the Mortgaged Property to be sold in the First Sale, serving as the "stalking horse bidder," which will be comprised of (1) a credit bid in the amount of $ 14 million, (2) satisfaction of the DIP Loan, and (3) a cash payment in the amount of $1,750,000.00. The cash payment is intended to provide the Debtors' bankruptcy estates with funds to pay other creditors, including unsecured creditors. Lender may assign its bid and its rights under this Agreement to a designee(s) (hereinafter, reference to "**Lender**" in regard to the sale process, conditions for receipt of title to property, and related matters shall include ARI and/or another assignee(s) of Lender, if any). Provisions regarding the timing for Lender to receive title to the property, if it is the successful bidder for the property, are stated below under paragraph 6.

e. The motion for authorization of the First Sale will provide that the proposed sale to Lender will be subject to higher offers/bids for the property, if qualified competing bids for the property are timely received in compliance with the bidding procedures order. The bidding procedures order submitted to the Bankruptcy Court shall define what is required for a

---

[1] The Van Ness parcel is subject to an easement held by the South Carolina Department of Transportation which renders this parcel to have no material sale value. This parcel is scheduled for a tax sale, and neither the Debtors nor Magnolia/ARC, as the mortgage creditor, intend to pay the taxes to redeem it.

EXHIBIT B

6

bid to be deemed a qualified competing bid, state the date by which such bids must be submitted, and include other provisions normally contained in bidding procedures orders used in bankruptcy sales in the Bankruptcy Court. Lender, as the stalking horse purchaser, will have the customary right to approve the proposed bidding procedures order before it is submitted to the Bankruptcy Court, which approval shall not be unreasonably withheld.

    f. The bidding procedures order submitted to the Bankruptcy Court will provide that Lender may increase its bid in response to a qualified competing bid, but any increase in Lender's bid must be made by increase in the cash component of its bid.

    g. The Debtors will engage a nationally known firm to market the property for the First Sale, and to work with the Debtors in regard to any bids received for the property.

    h. The hearing on the First Sale will be 120 days, or as close to 120 days as reasonably possible, after the filing of the sale motions.

    i. The sale of the Columbia Nitrogen Tract will be upon terms and by a process similar to the sale terms and process for the First Sale; however, the sale terms and process for the Columbia Nitrogen Tract may be modified from those used for the First Sale as necessary or appropriate for the specific matters to be addressed for the Columbia Nitrogen Tract.

    6. <u>Provisions Regarding Conveyance of the First Sale Property</u>. If Lender is the successful bidder for the property in the First Sale, it will receive title to all property in the First Sale except for the Beazer Parcel within ten (10) days after entry of the order authorizing such sale.[2] Due to contamination on the Beazer Parcel and the remediation requirements for it, the conveyance of the Beazer Parcel will not occur until the conditions set forth below under subparagraph c have been accomplished. The following provisions shall apply:

    a. The purchase price to be paid by Lender for the property in the First Sale shall be paid at the time of the conveyance to Lender of the First Sale property excluding the Beazer Parcel (the conveyance of which is subject to the conditions stated in subparagraph c below). As stated above, the conveyance of the First Sale property excluding the Beazer Parcel is to occur within ten days after entry of the final order authorizing the sale.

    b. Upon the payment of Lender's bid/purchase price for the First Sale property, Lender will be deemed to hold an irrevocable right to receive title to the Beazer Parcel.

    c. Although the Lender purchase price for the Beazer Parcel will have been fully paid, title of the Beazer Parcel will not be transferred to Lender until the following conditions have been accomplished:

    (i) Approval of Technical Impracticability by the EPA and the issuance of a revised Record of Decision;

---

[2] The rights of competing bidders for the property in the First Sale will be addressed in the Court's order establishing bidding procedures.

EXHIBIT B

7

    (ii) Lender's receipt of funding to perform the necessary and appropriate work to remediate and prepare the property for conveyance to Lender, which work is projected to have a total cost of $25 million;

    (iii) Removal of the Beazer Parcel from the NPL;

    (iv) Successful entry of the portions of the Beazer Parcel now on the NPL into the South Carolina Voluntary Cleanup Program;

    (v) Subdivision of the Former Treatment Area (4.1 acres) of the Beazer Parcel from the other parts of the Beazer Parcel;

    (vi) Agreement with Beazer East, Inc. ("**Beazer**") regarding ongoing conditions and obligations with respect to non-Former Treatment Area portions of the Beazer Parcel, including modification of deed restrictions, removal of indemnities, and money provided by Beazer for contribution to the costs of cleanup of the Old Impoundment Area of the property; and

    (vii) Filling of the wetlands necessary to accomplish removal from the NPL, based upon an EPA approved plan.

   d. As more fully set forth under paragraph 10 below, upon entry of the order authorizing the sale of the First Sale property to Lender, Lender will be granted the unrestricted right of access to the Beazer Parcel, the right to conduct activities and work on the property for remediation of the property and the preparation of it for conveyance, and to take actions and negotiate with regulatory authorities and other companies and persons in furtherance of accomplishing the conditions stated in subparagraph c above.

   e. If Lender is the successful bidder for the property in the First Sale and the conditions stated in subparagraph c above have not been accomplished within sixty (60) months, the Beazer Parcel will be sold at public auction. In regard to the conditions and the period allowed for satisfying them:

    (i) Lender commits that it will undertake and fund the satisfaction of the first condition stated in item 6c(1) above promptly upon entry of the order authorizing the First Sale to Lender, by and through the preparation and submission of a plan to EPA within six months of entry of the order;

    (ii) Lender will indemnify the Debtors for any damages or costs caused by Lender's activities on the Beazer Parcel; and

    (iii) If the conditions for the transfer of title of the Beazer Parcel to Lender are not satisfied within the allowed period and the property is sold at public auction (as provided in this subparagraph e), the sale proceeds from such auction will be first applied to pay the costs of the auction sale, then to reimburse the Debtors for any costs they have incurred in connection with such sale of the Beazer Parcel, and then the balance will be paid to Lender.

                     EXHIBIT  B

    f. Lender reserves the right to waive any of the conditions stated in subparagraph c above, in whole or in part.

    g. As more fully set forth under paragraph 10 below, upon entry of the order authorizing the sale of the First Sale property to Lender, Lender will be granted road, utility, drainage, construction, maintenance and access easements across the Beazer Parcel to the other First Sale property as needed for the development of the other First Sale property. In addition, upon entry of the order authorizing the sale of the First Sale property to Lender, the Debtors and Lender will enter into other agreements customary and appropriate for the development of the property. The specifics of these easements and agreements will be provided to the Debtors not less than thirty (30) days prior to the hearing on the motion for authorization of the First Sale property.

   7. <u>Immediate Conversion of Loan Indebtedness to Non-Recourse Secured Indebtedness</u>. The provision in the Cooperation Agreements for the release and discharge of the Debtors from the Loan indebtedness is hereby clarified, modified and amended to provide as stated in this paragraph 7 of this Agreement, and this paragraph 7 provision shall replace the release and discharge provisions stated in the Cooperation Agreements. This provision stated in this paragraph 7 also shall be effective for purposes of this Agreement, without regard to the status of the Cooperation Agreements. Upon the execution of this Agreement, (a) the Debtors, and each of their officers, directors, shareholders, partners, members, managers, direct and indirect parents, subsidiaries and affiliated companies, specifically including Cherokee Investment Partners III, L.P. and Cherokee Investment Partners III Parallel Fund, L.P., and their respective heirs, personal representatives, successors and assigns (each such Person, in such capacity, a "**Released Person**") are hereby released from personal liability for indebtedness under the Loan and released from any and all claims, demands, obligations, liabilities, breaches of contract, breaches of duty or any relationship, acts, omissions, misfeasance, malfeasance, cause or causes of action, judgments, debts, controversies, damages, costs, losses and expenses, of every type, kind, nature, description or character (collectively and individually, the "**Claims**"), and irrespective of how, why, or by reason of what facts, whether heretofore or now existing, or which Claims could, might, or may now or hereafter be claimed to exist, of whatever kind, name or nature, whether known, unknown, past or present, latent or patent, suspected or unsuspected, anticipated or unanticipated, liquidated or unliquidated, each as if they were fully set forth herein at length, which may in any way arise out of, are connected with or relate to the Mortgaged Property or the Baker Hospital Property, (b) the indebtedness under the Loan is hereafter non-recourse secured indebtedness, without personal liability for the Debtors or any other Released Person, and (c) the liens on and the security interests in the Debtors' Mortgaged Property securing the Loan shall remain effective and enforceable as to such property until such property is sold, notwithstanding this release of the Debtors and any other Released Person from personal liability for the Loan indebtedness.

   8. <u>Waiver of Unsecured Deficiency Claim in the Bankruptcy Cases</u>. In parallel to the provision in paragraph 7 above, Lender waives any unsecured deficiency claim it otherwise may have in the Debtors' bankruptcy cases.

   9. <u>Reassignment of Judgment Against PCS to Ashley II</u>. Upon the execution of this Agreement, Lender will arrange for the reassignment to Ashley II of the judgment Ashley II

9    EXHIBIT B

obtained against PCS in the amount of $147,617.02 (plus interest accrued thereon) in Civil Action No. 2:05-cv-2782-MBS in the United States District Court for the District of South Carolina, which Ashley II previously assigned to Magnolia/ARC, L.P., and which Magnolia/ARC, L.P. subsequently assigned to an affiliate of Lender. Ashley II may use the judgment in addressing the claim(s) asserted by PCS in Ashley II's bankruptcy case.

10. <u>Grant of Authorization for Acts, Communications, and Negotiations Regarding the Property</u>. In furtherance of accomplishing the conditions stated in paragraph 6c hereinabove, the Debtors authorize Lender as follows:

a. Ashley I and Ashley II authorize and grant Lender the non-exclusive right to negotiate directly with Beazer in regard to that certain real property that is the subject of that certain contract with Beazer (such contract, as amended, the "**Beazer Agreement**") (which property and other related tracts comprise the Beazer Parcel), including but not limited to the specific authorizations granted under subparagraphs c and d below.

b. Ashley I and Ashley II authorize and grant Lender the non-exclusive right to obtain extensions of the Due Diligence Period (as such term is described in the Beazer Third Amendment). Upon receipt, from time to time, of written requests from Lender, Ashley I and Ashley II shall execute any agreement with Beazer extending such Due Diligence Period.

c. Ashley I and Ashley II authorize and grant Lender the non-exclusive right to negotiate other changes to the Beazer Agreement and the right to enter into a separate agreement with Beazer with respect to the Beazer Parcel, in Lender's sole discretion, so long as such separate agreement is subject to Lender's acquisition of title to portions of the Beazer Parcel.

d. In the event that Lender is the successful bidder for the First Sale property, Ashley I and Ashley II further agree to execute and place into escrow that certain <u>Assignment and Assumption of Rights</u> attached hereto as *Exhibit A* (the "**Assignment of Rights**"), by which Ashley I and Ashley II transfer and assign to Lender, and Lender agrees to assume the benefits, rights, and obligations afforded to Ashley I by the Beazer Agreement. The Assignment of Rights shall be held in escrow pursuant to the terms of an escrow agreement (the "**Escrow Agreement**") to be entered into of even date herewith by and between Lender, Ashley I, Ashley II and Moore & Van Allen PLLC ("**Escrow Agent**"). The Escrow Agreement shall provide, among other things, that the Assignment of Rights shall be delivered out of escrow to Lender upon transfer of title to portions of the Beazer Parcel to Lender. At the time that the Assignment of Rights is released from escrow, Lender may request that the Assignment of Rights be returned to Ashley I and Ashley II and that they execute and deliver a replacement Assignment of Rights in favor of an entity designated by Lender. Upon such request, Ashley I and Ashley II shall promptly execute and deliver such replacement Assignment of Rights to Designee.

e. If Lender is the successful bidder for the First Sale property, Ashley I agrees that after the payment of the purchase price for the First Sale property, Lender may elect, on behalf of Ashley I, to subdivide the Beazer Parcel at any time prior to the transfer of title to the Beazer Parcel to Lender. If Lender elects, Ashley I shall cooperate, at no cost to Ashley I, with Lender's proposed subdivision of the Beazer Parcel, including, without limitation, signing

10

EXHIBIT B

all applications and documents requested by Lender in connection with such subdivision. Ashley I shall not be required to incur any expense or assume any affirmative obligations (except the foregoing obligation to cooperate with the subdivision) as part of or with respect to the subdivision.

      f.      <u>Agency Discussions</u>: Ashley I and Ashley II authorize and grant Lender the right to engage in direct discussions with any governmental regulatory agency charged with oversight of the environmental conditions at, on, under or near the Debtors' property, including but not limited to discussions with the EPA and DHEC. Such discussions may include but shall not be limited to, (i) bona fide prospective purchaser status pursuant to the CERCLA, (ii) non-responsible party status pursuant to the South Carolina Brownfields/Voluntary Cleanup Program, (iii) the Columbia Nitrogen Parcel including but not limited to issues associated with the EPA lien and pending lawsuit and (iv) the Beazer Parcel including, but not limited to, de-listing portions of Beazer Parcel from the CERCLA National Priorities List and including investigation and remediation.

      g.      <u>Remedial Activities</u>: Ashley I and Ashley II authorize and grant Lender the right, after payment of its purchase price for the First Sale property, to perform investigation and/or remediation on all or portion of the First Sale property that Lender deems necessary prior to taking title to such property.

      h.      <u>Magnolia TIF/MID</u>: Ashley I and Ashley II authorize and grant Lender the non-exclusive right to engage in discussions with the City of Charleston to obtain reimbursement from and participate in Tax Increment Financing ("**TIF**") with respect to TIF and to obtain further modifications to the TIF and MID currently applicable to the First Sale property.

      i.      <u>Utilities & Infrastructure</u>: Ashley I and Ashley II authorize and grant Lender the right, after payment of its purchase price for the First Sale property, to access the First Sale property for purposes of installing utilities and/or making other infrastructure improvements which Lender deems necessary prior to taking title to such property.

      j.      <u>Grading & Construction</u>. Ashley I and Ashley II authorize and grant Lender the right, after payment of its purchase price for the First Sale property, to access the First Sale property for purposes of conducting grading, earthwork, and/or other construction activities which Lender deems necessary prior to Lender taking title to such property.

12. <u>Survival of Provisions of this Agreement</u>. In the event that some provisions of this Agreement are not capable of performance by the Parties, the remaining provisions of the Agreement shall remain in full force and effect.

13. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of South Carolina, without regard to any conflicts of law provision which would require the application of the law of any other jurisdiction. Upon commencement of the Debtors' bankruptcy cases, the Parties agree that the Bankruptcy Court will have jurisdiction of all matters arising out of, or in connection with this Agreement.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first written above.

**MAGNOLIA/ARC LENDER, LLC**, a South
Carolina limited liability company

By:    MWV-MAGNOLIA/ARC I, LLC,
        A Delaware limited liability company

Its:    Authorized Director

By:    _____
        Kenneth T. Seeger
        President and Chief Executive Officer


**ASHLEY I , LLC**

By:    Prodel, LLC, its Manager

By:    _____
        Craig Briner, its Manager


**ASHLEY II OF CHARLESTON, LLC**

By:    Prodel, LLC, its Manager

By:    _____
        Craig Briner, its Manager

EXHIBIT B

**ASHLEY I , LLC**

By:   Prodel, LLC, its Manager

By:   _/s/ Craig Briner_
      Craig Briner, its Manager



**ASHLEY II OF CHARLESTON, LLC**

By:   Prodel, LLC, its Manager

By:   _/s/ Craig Briner_
      Craig Briner, its Manager

EXHIBIT B

13