## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re:<br><br>Ashley I, LLC, and<br>Ashley II of Charleston, LLC [1]<br><br>　　　　　　　　　　Debtor. | Chapter 11<br><br>Case No. 16-00559-dd<br><br>Jointly Administered |

**ORDER AUTHORIZING: (1) THE SALE OF ASSETS OF THE DEBTORS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS PURSUANT TO 11 U.S.C. § 363; AND (2) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. §365**

　　THIS MATTER came before the Court for hearing on the <u>Debtors' Motion for Order Authorizing: (1) the Sale of Assets of the Debtor Free and Clear of Liens, Claims, Encumbrances, and Other Interests Pursuant to 11 U.S.C. § 363; and (2) Authorizing the Assumption and Assignment of Executory Contracts Pursuant to 11 U.S.C. § 365</u> filed on February 8, 2016 (the "<u>Sale Motion</u>") by Ashley I, LLC ("<u>Ashley I</u>") and Ashley II of Charleston, LLC ("<u>Ashley II</u>", and collectively with Ashley I, the "<u>Debtors</u>") in each of their respective cases [Doc 5 in the Ashley I case, and also Doc 5 in the Ashley II case], in which the Debtors seek (1) approval of the terms of a proposed sale of a substantial portion of the Debtors' real estate and related assets, including contracts, permits, goodwill, and all documents and rights relating thereto as more fully described in the <u>Asset Purchase Agreement</u> ("<u>APA</u>"), as now amended by the <u>Amended and Restated Asset Purchase Agreement</u> (the "<u>Amended APA</u>") (Doc 146-1), to Magnolia/ARC Lender, LLC ("<u>MARC</u>"), or its assigns ("<u>Purchaser</u>"), free and clear of liens, claims, and encumbrances pursuant to 11 U.S.C. §§ 363(b) and (f) for a purchase price of approximately $16,425,000[2] (the "<u>Purchase Price</u>"), which consists of $1,750,000 in cash paid within ten (10) days of the date of the Final Order Approving Sale, and a credit bid in the amount of $14,000,000, plus satisfaction of the Debtor in Possession Loan (the "<u>DIP Loan</u>") made by MARC to the Debtors in the estimated amount of

---

[1]　Ashley I, LLC filed its Chapter 11 petition on February 8, 2016, which is designated as Case No. 16-00559-dd in this Court; Ashley II of Charleston, LLC also filed its Chapter 11 petition on February 8, 2016, which is designated as Case No. 16-00560-dd in this Court.  On February 17, 2016, the Court entered an order in each of the two cases [Doc 31 in the Ashley I case, and Doc 35 in the Ashley II case] joining the cases for joint administration, with Case  No. 16-00559-dd being the lead case.

[2] Based upon the Debtors' use of the full $675,000 Debtor in Possession Loan.

1

$675,000; and (2) authorization of the assumption and assignment of certain executory contracts pursuant to 11 U.S.C. § 365.[3] In connection with its acquisition of the assets under the APA, the Purchaser has also set forth a procedure by which it may spend up to $25,000,000 to mitigate past environmental contamination of a portion of the properties that are the subject of this Motion (the "Koppers Tract"). Copies of the Sale Motion, Notice of Hearing, and Order Establishing Bidding and Other Procedures in Connection with the Sale of Assets of the Debtors and Granting Protections to the Proposed Purchaser entered on February 23, 2016 ("Bid Procedures Order") were served on all creditors, parties in interest, and provided to all parties that had expressed an interest in purchasing the Debtors' assets.

After considering the Sale Motion, any and all responses and objections filed thereto, and the arguments and evidence presented by counsel at the hearing on the Sale Motion, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT[4]

**Background**

1. The Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code on February 8, 2016 (the "Petition Date"). The Debtors are operating their businesses and managing their assets as debtors in possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code.

2. The Debtors are single asset real estate entities that began acquiring real estate in 2002 for the purpose of developing a multi-use real estate development as a proposed urban infill project along the Ashley River in the Neck area of Charleston and North Charleston, South Carolina. The Debtors' current real property holdings consist of approximately 182 acres, composed of roughly 134 acres of highland and roughly 48 acres of marsh along the Ashley River north of Wagener Terrace and west of 1-26.

3. This sale to the Purchaser is a sale of a substantial portion of the Debtors' assets, including real estate, contracts, permits, intellectual property, rights in the Debtors' real property, goodwill, and all documents and rights relating thereto as more fully described in the APA as

---

[3] 11 U.S.C. §§ 101, *et seq.*, will hereinafter be referred to as the "Bankruptcy Code" and further references to sections of the Bankruptcy Code will be made by section number only.

[4] To the extent that any "Finding of Fact" in this Order constitutes a "Conclusion of Law," or that any "Conclusion of Law" constitutes a "Finding of Fact," such findings and conclusions in this Order shall be deemed as such and treated as though they are set forth under the appropriate heading.

amended. The assets being sold shall, hereinafter, be referred to as the "Purchased Assets."

4.  This sale does not include the Debtors' cash and cash equivalents, accounts receivable, tax refunds, corporate records, insurance policies, or any avoidance claims under chapter 5 of the Bankruptcy Code. Further this sale does not include Ashley II's real property known as the "Columbia Nitrogen Tract" and identified by TMS Numbers 466-00-00-018 and 466-00-00-051. The assets excluded from the sale shall, hereinafter, be referred to as the "Excluded Assets."

5.  As of the Petition Date, there were mortgages and other liens on the Debtors' real property in the asserted amounts of approximately $18,638,332.65 to MARC and approximately $3,700,000 to the United States Environmental Protection Agency (the "EPA"). The EPA lien is on the Columbia Nitrogen Tract owned by Ashley II and does not encumber the Purchased Assets.

6.  The Debtors owe approximately 11 trade vendors general unsecured claims in the approximate aggregate amount of $137,582.47.

7.  The Debtors have scheduled contingent and/or disputed claims for 21 unsecured creditors that may have claims related to environmental indemnities ("Indemnity Claims") negotiated during the purchase of the Debtors' real estate holdings. The Indemnity Claims are contingent to the extent that conditions precedent to the contractual indemnity provision have not occurred. Indemnity claims for nineteen (19) parties have been scheduled at $0.00 since no request for indemnification has been made upon the Debtors. Indemnity claims for Quala Services, LLC, f/k/a Allwaste Tank Cleaning, Inc. ("Allwaste") and for J. Henry Fair, Jr., Holcombe Enterprises, LP and Charles Lane and Edwin Cooper, III as Personal Representatives of the Estate of James H. Holcombe (collectively, "Holcombe & Fair"), have been scheduled in unknown amounts on Ashley II's Schedule F, on the basis that the amounts of the claims and the extent of the indemnities have not yet been determined.

8.  Ashley II has also scheduled a contingent, disputed and unliquidated claim for PCS Nitrogen, Inc. ("PCS"). Any claim by PCS is subject to set off from the $142,617.02 judgment[5], which Ashley II holds against PCS.

9.  The Debtors also have approximately five unexpired lease agreements under which the Debtors are the lessors and have obligations to lessees for the rental of real property. It appears that the Debtors were current on their lessor obligations as of the Petition Date and that they have remained current on such obligations post-petition. The full list of the Debtors' lease agreements and executory contracts being assumed and assigned (the "Assigned Contracts") pursuant to this Order are shown on Schedule 1(c) to the Amended APA (Doc 146-1), which is hereby incorporated

---

[5] This amount is to be increased by interest accruing on this judgment amount since the entry of the judgment.

3

by reference. The Cooperation Agreement dated May 18, 2013 between the Debtors and MARC and the Cooperation Agreement dated May 18, 2013 between the Debtors and Ashley River Investors, LLC ("ARI") (these two agreements, collectively, the "Cooperation Agreements") are not being assumed or assigned pursuant to this Order, and thus are excluded from the Assigned Contracts.

10. The Debtors' gross revenues from the occasional sale of real estate and rental income have not been high enough to sustain their businesses. The Debtors state that protracted litigation related to the environmental liabilities of certain of the Debtors' properties, which are former industrial sites, has prevented the Debtors from obtaining the funds necessary for the intended cleanup of the area.

11. Pre-petition, the Debtors funded their operations through advances made pursuant to the Cooperation Agreement with their secured creditor, MARC. Post-petition, such operations have been funded through the DIP Loan the Debtors obtained from MARC.

**The Proposed Sale**

12. Effective as of February 26, 2016, the Debtors and the Purchaser entered into the APA for the sale of the Purchased Assets. The APA and the Amended APA are incorporated herein by reference.

13. The Purchaser agreed to pay an aggregate Purchase Price of approximately $16,425,000 plus assumption of the Debtors' unexpired lease contracts related to the Purchased Assets. As set forth in greater detail in the Amended APA, the Purchase Price is primarily comprised of $1,750,000 in cash consideration, a credit bid of $14,000,000 of the MARC secured claim, satisfaction of the DIP Loan up to the approximate amount of $675,000, and assumption of all of the post-closing liabilities and obligations owed under the Assigned Contracts. The Purchaser has also agreed that it may spend up to $25,000,000 to mitigate past environmental contamination of the Purchased Assets.

14. The sale to the Purchaser was subject to completion of the due diligence investigation period under the Amended APA. The due diligence investigation was completed, and the period allowed for it expired, prior to entry of this order.

15. The Debtors each filed a Plan of Reorganization on August 9, 2016, (as amended the "Debtors' Plans"), providing for this sale of assets. The confirmation hearing on Debtors' Plans is scheduled for November 15, 2016. The transactions described in the Sale Motion are a sale in contemplation of the Debtors' Plans. In the event the transactions occur after Debtors' Plans are confirmed, such transactions will constitute a transfer under a plan confirmed consistent with § 1146

4

of the Bankruptcy Code.

16. The closing of this sale is scheduled to occur no later than ten (10) business days following the date that this order approving the sale becomes a final order (the "Closing Date"). Due to contamination on the Koppers Tract and the Charleston Public Works ("CPW") Tract, and the remediation requirements for them, the conveyance of the Koppers Tract and the CPW Tract will not occur until the conditions set forth in § 4.6 of the Amended APA have been accomplished (the "Conveyance Date").

17. Upon closing, the Purchaser will assume the post-closing liabilities under the Assigned Contracts.

18. The Debtors propose that proceeds of the sale be held pending further order of the Court or until confirmation of the Debtors' Plans of Reorganization.

19. The Amended APA and the Bid Procedures Order provided for certain payments to the Purchaser in the event that successful competing bids were received by the Debtor and allowed by the Court. Since MARC is the successful bidder in this sale, no such break-up fees or reimbursement of expenses are sought by the Purchaser and none will be paid by the Debtors.

20. The Debtors retained the services of Colliers International Charleston, LLC and Colliers International – Atlanta, LLC (collectively "Colliers") as broker for the purposes of marketing the property. At the hearing on the Sale Motion counsel for the Debtors proffered the testimony of Hagood S. Morrison of Colliers regarding the marketing efforts both in print and online, the size of the market reached, the receipt of over 70 signed non-disclosure agreements, the access given to a confidential information memorandum and other extensive documentation available through access to a computer data room, and the several physical tours of the property. Two bids were received, one a non-binding letter of intent from Mackie Developments and the other the bid of TPA Acquisitions 1, LLC ("TPA"). Counsel for the Debtors further proffered Mr. Morrison's testimony that in his experienced opinion the Debtors successfully penetrated the market for buyers for real estate sales in the condition of the Purchased Assets.

21. The bid from TPA was timely received on Tuesday, October 11, 2016 and met the requirements of the Bid Procedures Order, in that the face amount of the bid was in the amount of $18,500,000.00, the submitted bid included satisfactory evidence of TPA's financial ability to timely consummate the purchase, the bid was accompanied by an earnest money deposit of $750,000, and the bid included a redlined asset purchase agreement highlighting the differences in TPA's asset purchase agreement in comparison with the Amended APA. The TPA bid, however, was materially different from the MARC stalking horse bid in that it was subject to a seventy-five (75) day inspection period during which TPA could terminate its purchase contract for any reason

or for no reason.

22. PCS, Holcombe & Fair, and Allwaste, as unsecured creditors of Ashley II, each advised the Court at the hearing that it was their position that the Court should accept the Debtors' recommendation and approve MARC as the winning bidder for the sale of the Purchased Assets.

23. Prior to the hearing, a single objection to the sale was received from PCS. PCS based its objection upon its concerns that MARC would be allowed to assume the Cooperation Agreements and that the order authorizing the sale of the Purchased Assets should make it clear that the sale is subject to the institutional controls recorded with respect to certain of the property. This objection was resolved on the record at the hearing.

24. The Debtors assert that the terms and conditions of the proposed sale are fair, reasonable and appropriate and were reached after arms-length negotiations and extensive bargaining between the Debtors and the Purchaser. The Debtors proffered that the Purchaser is an entity that is purchasing the property of the Debtors in good faith.

25. Based upon the foregoing, Debtors have determined in the exercise of their best business judgment that the stalking horse bid of MARC is the best bid for the Purchased Assets, and is fair and reasonable. The Debtors along with PCS, Holcombe & Fair, and Allwaste have further determined that acceptance of the stalking horse bid is in the best interest of the Debtors' estates and all of their creditors. MARC in its capacity as the secured creditor consents to the sale.

**Remaining Institutional Controls at the Beazer/Koppers Tract**

26. The APA as amended shall not be interpreted to preclude the government from pursuing claims for environmental liabilities against the Debtors and the Debtors' estates for any obligation of the Debtors relating to the property of the Debtors or the operation of the Debtors' business.

27. Any purchaser or transferee of contaminated or disturbed or defective property from the Debtors should not be permitted to own or operate such property without having to comply with police or regulatory laws that apply to all owners and operators of property – regardless of whether the property may have been contaminated, disturbed or made defective by prior owners. No one is entitled to maintain a nuisance or threat to public health. Any buyer will need to comply with applicable law requiring that it exercise "due care" to protect persons on the acquired property from contamination or defects even though such contamination or defects may have originated prior to the sale.

6

28. Nothing in the Amended APA or this order shall release, nullify, preclude, or enjoin the enforcement of any police or regulatory authority of a governmental unit that any entity would be subject to as the owner or operator of property after the date of entry of this order. Nothing in the Amended APA or this order authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police or regulatory law. Nothing in the Amended APA or this order shall divest any tribunal of any jurisdiction it may have under police or regulatory law to interpret this order or to adjudicate any defense asserted under this order.

29. The Debtors have acknowledged that, as it pertains to § 4.6 of the Amended APA, any decision of the EPA, including among other things the approval of a Technical Impracticability Waiver and removal of a site from the National Priorities Listing ("NPL"), are within the EPA's sole and unreviewable discretion.

**The Assumption/Assignment of Executory Contracts**

30. As part of the Sale Motion, the Debtors also request authority to assume the executory contracts set forth in Schedule 1(c) to the Amended APA, upon entry of a final order approving the sale and to assign such assumed contracts to the Purchaser.

**CONCLUSIONS OF LAW**

**I.    Purchaser's Bid is in the Best Interest of the Estate**

The bid from TPA was timely received on Tuesday, October 11, 2016 and met the requirements of the Bid Procedures Order, in that the face amount of the bid was in the amount of $18,500,000.00, the submitted bid included satisfactory evidence of TPA's financial ability to timely consummate the purchase, the bid was accompanied by an earnest money deposit of $750,000, and the bid included a redlined asset purchase agreement highlighting the differences in TPA's asset purchase agreement in comparison with the Amended APA. The Court finds that TPA's bid was a Qualified Competing Bid.

Despite TPA's bid being higher, the Court finds that the Purchaser's bid is in the best interest of the estate and creditors. TPA's bid was different from the MARC stalking horse bid in that it was subject to a seventy-five (75) day inspection period during which TPA could terminate its purchase contract for any reason or no reason. PCS, Holcombe & Fair, and Allwaste, as unsecured creditors of Ashley II, each advised the Court at the hearing that it was their position that the Court

7

should accept the Debtor's recommendation and approve Purchaser as the winning bidder for the sale of the Purchased Assets. Because of the lack of certainty and commitment from TPA to the purchase and the recommendation of certain unsecured creditors, the Purchaser's bid is in the best interest of the estate and creditors.

**II.    The Sale**

Section 363(b) of the Bankruptcy Code authorizes the Debtors to sell property of the estate outside the ordinary course of business after notice and a hearing. Such property can be sold free and clear of any interest in the property if each party holding such an interest consents. 11 U.S.C. § 363(f). Sales of property under § 363(f) are limited to sales of property of the estate. In re Taylor, 198 B.R. 142, 158 (Bankr. D.S.C. 1996). In the present case, the Purchased Assets are owned by the Debtors, and the sole secured creditor, the Purchaser, consents to this sale.

The Debtors seek the Court's authorization to sell the Purchased Assets pursuant to § 363(b)(1) and (f), outside the ordinary course of business, in conjunction with confirmation of the Debtors' Plans, which incorporate this sale into the plan provisions. Although courts prefer that sales be conducted pursuant to a plan of reorganization, this Court has recognized that when a sound business justification exists, it may authorize a sale pursuant to § 363(b)(1) without a confirmed plan of reorganization. In re Taylor, 198 B.R. 142, 156-157 (Bankr. D.S.C. 1996); see also Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986); In re WBQ Partnership, 189 B.R. 97 (Bankr. E.D. Va. 1995).

Under the sound business purpose test, the Debtor has the burden of proving that:
   a. sound business reason or emergency justifies a pre-confirmation sale;
   b. the sale has been proposed in good faith;
   c. adequate and reasonable notice of the sale has been provided to interested parties; and
   d. the purchase price is fair and reasonable.

See In re Taylor, 198 B.R. at 157.

A.    **Sound Business Reason or Emergency**

In the present case, sound business judgment and the circumstances of this case warrant the sale of the Purchased Assets at or prior to confirmation of the Debtors' Plan. The Debtors are unable to fulfill their goal and effectuate the cleanup of the formerly industrial properties. As shown by the previous loan advances made by MARC to enable the Debtors to continue maintenance of the properties and required environmental monitoring, the Debtors' revenues are not sufficient to cover their operating costs. Moreover, the litigation with other parties bearing responsibility for polluting

8

the properties comes with significant costs, which the Debtors cannot fund. This sale will generate $1,750,000 of unencumbered funds for the Debtors' estates and repay the DIP Loan. MARC has stated that, after the period of extensive marketing for this sale – 180 days of marketing, and a total of 237 days from the entry of the Bid Procedures Order to the date of the hearing on the sale - if the sale is not closed soon, it cannot justify its Purchase Price for the Purchased Assets and it will withdraw and/or reduce its offer for the assets. If this sale is not consummated reasonably quickly and smoothly, the Debtors will be unable to continue with the most basic maintenance and monitoring obligations, and they are at risk of loss of value for the Purchased Assets.

    B.    **Good Faith**

The Court finds that the terms and conditions of the proposed sale are fair, reasonable and appropriate and were reached after arms-length negotiations and extensive bargaining between the Debtors and their professionals with representatives of the Purchaser. The Debtors sought third party purchase offers pre-petition, and submitted this sale to advertisement and competitive bidding over a post-petition period of approximately 180 days prior to the auction and sale hearing. The Debtors presented testimony (by proffer, without objection) at the hearing on the Sale Motion that the Debtors and the Purchaser proceeded in good faith. As a provision of its purchase, the Purchaser seeks the protections afforded to sale transactions under § 363(m). Consequently, the Court finds that the Purchaser is entitled to the protections afforded to sale transactions under § 363(m).

    C.    **Notice**

All creditors and parties in interest, including those parties who may have expressed an interest in purchasing the Purchased Assets were served a copy of this Motion, the Bid Procedures Order, and notice setting the hearing on the Sale Motion and the Amendments to the Sale Motion. The Debtors and their real estate professional expended significant efforts to market their assets. With the assistance of MARC, the Debtors and their real estate professional created a data room accessible to any potential purchaser wishing to view records and data related to the condition of Purchased Assets, subject to the execution of a confidentiality agreement where appropriate. Based upon the foregoing, the Court finds that notice is adequate and reasonable.

    D.    **Purchase Price**

The Court finds that the Purchase Price for the Purchased Assets is reasonable and fair and currently represents the best recovery for the Debtors and their creditors for the Purchased Assets. The sale of the Purchased Assets to the Purchaser was subject to higher or otherwise better competing offers under fair procedures approved by this Court in the Bid Procedures Order, and the Purchaser's offer was the best offer. Based upon the foregoing, the Court finds that the sale is in the best interests of the estate and its creditors.

**III.     The Assumption of Executory Contracts**

Section 365(a) provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the ebtor." 11 U.S.C. § 365(a). Section 365(b) requires a debtor in possession to satisfy certain requirements, such as curing defaults, compensation for pecuniary losses and adequate assurance of future performance, at the time of assumption if a default exists under the contracts to be assumed. See 11 U.S.C. § 365(b)(1)(A)-(C). By way of the Sale Motion, the Debtors seek to assume the Assigned Contracts and to assign such contracts to the Purchaser.

The standard applied to determine whether the assumption or rejection of an executory contract or unexpired lease should be authorized is the "business judgment" standard. See Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043 (4th Cir. 1985). It appears that the Debtors served the Sale Motion and notice of the sale hearing on all creditors and parties in interest in this matter pursuant to the certificate of service filed herein by counsel for the Debtors. It further appears that the Debtors have given adequate notice of their intention to assume/assign these Assigned Contracts set forth on Debtors' Schedule G, as amended. It further appears that the Debtors have, in connection with the proposed sale, exercised reasonable business judgment with regard to the assumption and assignment of their executory contracts.

The Debtors' Sale Motion asserts that the Debtors are current on payment for all of their executory contract obligations and intend to remain current on all such obligations, and no party has objected or appeared to assert anything to the contrary. Therefore, the Debtors have satisfied the requirements of § 365, including §§ 365(b)(1)(A) and (B) and 365(f), in connection with the sale and the assumption and assignment of the Assigned Contracts. The Purchaser has demonstrated adequate assurance of future performance with respect to the Assigned Contracts pursuant to § 365(b)(1)(C). The assumption and assignment of the Assigned Contracts pursuant to the terms of this Order is integral to the Amended APA and is in the best interests of the Debtors, their estates, creditors and other parties in interest, and represents the exercise of sound and prudent business judgment by the Debtors.

Based upon the foregoing findings and conclusions, it is hereby

**ORDERED** that:

A.     The Sale Motion is GRANTED, and the Debtors are authorized to proceed with the closing of the Sale of the Purchased Assets to the Purchaser in accordance with the terms of this Order and the terms of the Amended APA, which is incorporated herein by reference.

B.     The Debtors shall hold all remaining sale proceeds pending confirmation of the Debtors' Plans or further order(s) of the Court.

C. The sale of the Purchased Assets is a prerequisite to the ability of Debtors to confirm and consummate a plan or plans of liquidation; therefore, the transactions contemplated by this order and the Sale Motion are a sale in contemplation of a plan. In the event the transactions occur after Debtors' Plans are confirmed, such transactions will constitute a transfer under a plan confirmed consistent with § 1146 of the Bankruptcy Code.

D. The terms and conditions of, and the transactions contemplated by, the Amended APA, are hereby approved in all respects; the sale and all related transactions contemplated thereby are hereby approved, authorized and directed under §§363(b) and (f). To the extent a conflict arises between the Sale Motion, the Amended APA, or any other documents related to the sale of the Purchased Assets, and this order, this order shall control.

E. Pursuant to §363(b) the Debtors are hereby authorized, directed and empowered to fully assume, perform under, consummate and implement the Amended APA together with all additional instruments and documents that may be reasonably necessary and desirable to implement the Amended APA and the related transactions contemplated thereby, and to take all further actions as may be reasonably requested for the purpose of assigning, transferring, granting, conveying and conferring the Purchased Assets to the Purchaser, or otherwise as may be appropriate to the performance of the Debtors' obligations as contemplated by the Amended APA.

F. The real property included in the Purchased Assets shall be conveyed subject to all matters of record related to compliance with Environmental Laws, including without limitation the covenants contained in that certain deed from Beazer East, Inc. to Ashley I, dated July 15, 2003 and recorded on July 17, 2003 in the Offices of the Register of Mesne Conveyances for Charleston County, South Carolina in Book W457 at Page 722, as may be amended.

G. Except as, and unless, expressly provided or exempted in the Sale Motion, the Amended APA or this order, the Purchaser shall not be liable for any claims, debts, liabilities or obligations of the Debtors whatsoever, whether known or unknown, foreseeable or unforeseeable, contingent, fixed, liquidated, unliquidated or otherwise.

H. The Purchaser is a third-party purchaser and is not a successor in interest to the Debtors. The Purchaser shall have no liability, including, without limitation, as a successor in interest or a successor entity, for any debts, claims or obligations of the Debtors arising prior to the date of closing of the purchase of the Purchased Assets, except as specifically set forth in the Amended APA and this order.

I. The Purchaser is a good faith purchaser for purposes of § 363(m) of the Bankruptcy

Code. The Purchaser is hereby found to have acted in good faith within the meaning of § 363(m) of the Bankruptcy Code at all times through the entry of this order, and is entitled to the protections of § 363(m).

J. The Assigned Contracts set forth in Debtors' Schedule 1(c) to the Amended APA, shall be deemed valid and binding and in full force and effect and assumed by the Debtors and sold and assigned to the Purchaser at the Closing, pursuant to §§ 363 and 365.

K. The Debtors are current on all pre-petition and post-petition obligations under the Assigned Contracts and shall remain current through the closing of the sale contemplated herein. Therefore, there are no cure costs associated with the Assigned Contracts and the Debtors are deemed to have satisfied the requirements of § 365, including §§ 365(b)(1)(A) and (B) and 365(f).

L. Upon the closing of the sale of the Purchased Assets under the Amended APA, in accordance with §§ 363 and 365, the Purchaser shall be fully and irrevocably vested in all right, title and interest of each Assigned Contract. The Debtors shall cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing.

M. Pursuant to §§ 365(b)(1)(A) and (B), except as otherwise provided in this order, the non-debtor parties to the Assigned Contracts are bound by the provisions of this order.

N. Any provision in any Assigned Contract that purports to declare a breach, default, or payment right as a result of an assignment or a change of control in respect of the Debtors is unenforceable, and all Assigned Contracts shall remain in full force and effect. No sections or provisions of any Assigned Contract that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor third party to the Assigned Contracts shall have any force and effect with respect to the sale transaction and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under § 365(f) because no party objected to such relief, and/or are otherwise unenforceable under § 365(e) because no party objected to such relief and no assignment of any Assigned Contract pursuant to the terms of the APA shall in any respect constitute a default under any Assigned Contract. The non-debtor party to each Assigned Contract shall be deemed to have consented to such assignment under § 365(c)(1)(B) because no party objected to such relief, and the Purchaser shall enjoy all of the rights and benefits under each such Assigned Contract as of the applicable date of assumption without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof.

O. The Purchaser has satisfied all requirements under §§ 365(b)(1) and 365(f)(2) to

provide adequate assurance of future performance under the Assigned Contracts.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**10/21/2016**



Entered: 10/21/2016

David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

13